HOUSTON ELECTRIC CO. v. PEARCE.
(No. 7275.)

(Court of Civil Appeals of Texas. Galveston. Jan. 18, 1917. Rehearing Denied Feb. 8, 1917.)

1. CARRIERS ☞318(3) — NEGLIGENCE — EVIDENCE—SUFFICIENCY.

Evidence in a street car passenger's action for personal injuries, *held* sufficient to sustain a finding that defendant was guilty of negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1307, 1308.]

2. DAMAGES ☞216(2)—INSTRUCTIONS—MEDICAL SERVICES.

In an action by a street car passenger for personal injuries, testimony of physician that he made five or six visits to plaintiff, and that $200 was a reasonable charge therefor, is sufficient to warrant an instruction to find for plaintiff the reasonable value of medical services.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 548.]

3. APPEAL AND ERROR ☞1053(4)—CARRIERS—HARMLESS ERROR.

In an action against a street car company for personal injuries to a passenger struck by a brake handle, admission of testimony that there were other and more efficient brakes than the gooseneck brakes, *held* harmless in view of instructions that jury was not to consider the brakes of an obsolete kind, and that defendant was not required to use the newest and safest appliances.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4180.]

4. APPEAL AND ERROR ☞302(6)—MOTION FOR NEW TRIAL — SPECIFICATION OF ERRORS — SUFFICIENCY.

An assignment in a motion for new trial that jury was caused to increase amount of award because of seeing plaintiff in a swoon or faint after retiring to deliberate, in the absence of a claim and showing that the verdict was excessive, is insufficient to warrant reversal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1749–1752.]

5. NEW TRIAL ☞44(3)—MISCONDUCT OF JURY—DISCRETION.

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 2021, providing that if the misconduct of the jury is proven, or the testimony received, or the communication made be material, a new trial may be granted in the discretion of the court, the refusal of a new trial is not an abuse of discretion, even though it appears that after the jurors had retired to deliberate they saw plaintiff while in a swoon carried to a carriage, and one of their number made the remark that he knew plaintiff and that she was injured as she claimed to be, where jurors testify that they considered only evidence adduced at trial in arriving at their verdict.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 82–84.]

6. CARRIERS ☞319(3)—DAMAGES—EXCESSIVE VERDICT.

Where the evidence in a personal injury suit by street car passenger tended to show that her injuries were permanent, a verdict of $12,000 is not so large as to indicate that it was the result of passion or prejudice.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1344, 1345.]

Appeal from District Court, Harris County; Henry J. Dannenbaum, Judge.

Action by Eula M. Pearce against the Houston Electric Company. Judgment for plaintiff. Defendant's motion for a new trial denied, and it appeals. Affirmed.

C. R. Wharton and R. C. Patterson, both of Houston, for appellant. Guynes & Colgin, of Houston, for appellee.

PLEASANTS, C. J. This is a suit to recover damages for personal injuries, brought by the appellee against the appellant.

The petition alleges, in substance, that plaintiff was injured by being struck by a brake handle on one of defendant's street cars in the city of Houston on which she was a passenger and from which she was proceeding to alight at the time she received said injury; that the brake by which she was injured was what is known as a gooseneck brake, and was deficient, worn-out, and obsolete, and not the safe kind of brake that was used by the defendant and other street car companies; "but on the contrary, was an obsolete brake, completely or partially worn-out, which would not stay or remain fastened when set, and which had an unnecessarily long and dangerous handle, liable to injure passengers passing within its reach in making their exit, and it would become loose and fly around with great force and violence, which it had often done theretofore, and which had often failed to perform its functions and services prior to said accident, all of which was well known to said defendant, or could have been known by the exercise of reasonable diligence. Plaintiff further alleges that said brake was deficient and dangerous in other respects unknown to her, and for which reason she is unable to set same out with particularity or otherwise"; that the defendant well knew that the brake was defective, obsolete, and dangerous, and not the safest that had been used and tried by it as well as other street railway companies; and that the defendant was guilty of negligence in using this dangerous

brake, and in permitting the passengers to make their exit near it.

By way of alternative pleading, the plaintiff avers that the motorman was guilty of negligence in stopping the car on a considerable grade, and setting the brake so as to permit it to swing loose with great force, and negligently failed to take the proper precaution in setting the brake.

The defendant answered, denying that the brake equipment was old, obsolete, or defective, and alleging that its machinery and appliances, including the brake, were in good condition; that they had been carefully installed and carefully inspected; and that the accident of which the plaintiff complains was not due to any negligence on its part, but rather was an unfortunate and unavoidable accident.

The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $12,000.

The evidence shows that plaintiff, as alleged in her petition, was injured by being struck by a brake handle on one of defendant's cars upon which she was a passenger and from which she was making her exit at the time of her injury. The brake had just been set by the motorman, and as plaintiff passed it, as she had to do to get off the car at the end from which she made her exit, it came loose and the handle flew around and struck plaintiff on her back and side. A gooseneck brake, which was the kind by which plaintiff was injured, is operated by an upright windlass with a crooked or gooseneck handle on the top and with which the windlass is turned. A chain connects the windlass with the brake proper, and the brake is set, that is, applied to the wheels of the car, by turning the windlass which winds the chain and pulls the brake against the wheels. When the brake is wound up if the handle is released the weight of the brake pulling on the chain will cause the windlass to revolve and the handle flies around with it. To prevent this a small wedge-shaped piece of iron called a "dog" is fastened to the floor of the car on a pivot near the bottom end of the windlass which has cogs attached to it. When the brake is wound up if the operator pushes the "dog" into one of the cogs on the bottom of the windlass the handle can be released and there will be no movement of the windlass. If neither the cog nor the dog is worn or defective and the dog is properly placed in the cog before the handle of the windlass is released the windlass cannot revolve, and there can be no movement of the handle unless the cog or the dog should break. If the dog is properly placed in the cog the brake could only be released by a very hard blow, unless the pressure was released by using the brake handle.

The motorman who set the brake in question testified:

"I brought the car to a full stop by winding up my brake. Before this accident I had no trouble with the car. I do not know how long that particular brake that was on the car at the time of the accident had been on it; it had been on there all the time I run the car. They had not changed brakes on the car while I was running it. During the time I run the car I did not have any trouble with the brakes; they were in good condition. The brake equipment on this car was in good condition before the accident. I had no trouble with it. I stopped the car and opened the exit door and wound up my brake. I opened the door after the car was standing still. When I wound up the brake I opened the exit door, then I wound it up tighter to turn up my register. I wound it up and turned the register, and then walked back and turned my back toward the exit door, and then I looked around, and just then the brake got loose. When I got through winding up the brake and turned around to go to the register I thought the dog was in. I turned the brake handle loose, and the dog semed to hold because I took my hand off the handle. When I took my hand off the brake did not fly against my hand or against me; it was standing still. When I went in to turn the register I had not gotten to the register when it flew loose. I had not gotten very far away from the brake when it flew around. I do not know what caused the dog to come out of the ratchet; it had never come out before. I run that car after that accident, but it never came loose on me after that. I did not say to the conductor after the accident that I had reported the brake several times."

Plaintiff introduced a witness who testified that on the day after the plaintiff was injured witness rode on this car with the motorman who set the brake by which plaintiff was injured, and the motorman showed witness how the brake was worn; that he saw the motorman use the brake to stop the car four or five times; and that he kept his foot against the "dog" while the brake was set.

Plaintiff testified that just after the brake struck her the conductor asked the motorman how it happened, and why he did not tell him of the trouble, and the motorman replied that "the brake flew loose and hit her in the back," and that he "had reported it to the company two or three times before that."

She further testified:

"I did not touch the brake myself in any way when I started to pass out."

E. L. Baker, witness for plaintiff, testified in part:

"If the brake was set up by the motorman, for say a minute, it would not come loose only on a grade and the brake was worn, that is, if both the ratchet and the brake—the ratchet and the dog was worn, unless the pin gave way, and then of course the ratchet would turn round. * * * I spoke about the dog being worn there. As I use that dog by kicking it in and out of place, it may wear sharper on the point."

I. D. Rainey, witness for plaintiff, testified in part:

"I think it is possible to set this brake on the edge of these cogs so that a jar would bring it loose. If the car was standing on a slant or any other position, and it was shaken by people coming off the car, in my opinion, if the brake wasn't properly set, it would not only be possible, but it would be probable, that the brake

would come loose, and more so, if these ratchets here were worn and the dog was worn, and the brake wasn't properly set."

The court instructed the jury that there was no evidence to sustain the allegations that the brake was obsolete, and they should disregard all such allegations in the petition. The portion of the charge submitting the issue of negligence to the jury is as follows:

"You will inquire from the evidence if these allegations are true, and in this connection you are charged that the defendant, as a common carrier, is not an insurer of the safety of its passengers, and that it was not incumbent upon the defendant to use the newest and safest appliances, but that it was incumbent upon it to use such appliances as a very cautious, competent or prudent person would have used under the same or similar circumstances, and if you find from a preponderance of the evidence that the defendant negligently equipped or used on said car a brake which was deficient or dangerous, or that the defendant's agents, servants and employés operating said car carelessly and negligently set the brake of said car, or let go said brake after having wound the same, without setting it, and if you further find, from a preponderance of the evidence, that all or either of said acts, if you find the existence of all or either of them, were or was, as the case may be, the proximate cause of the alleged accident, then let your verdict be for the plaintiff."

No grounds of negligence other than those stated in this paragraph of the charge were submitted to the jury.

[1] The first three assignments of error assail the charge above set out on the ground that there was no evidence to sustain a finding that defendant was guilty of negligence in any of the respects stated in the charge. None of the assignments can be sustained. We think the evidence before set out conclusively shows that the brake got loose because of the worn and defective condition of the "dog" or "cog," or because of the motorman's failure to put the "dog" in the "cog" before releasing the handle, or performed that duty in such a careless and negligent manner that the "dog" failed to catch in the "cog" and prevent the windlass from turning after the handle was released. This is necessarily true, because the undisputed evidence shows that the brake got loose and the handle struck the plaintiff, and that it could not have gotten loose if the "dog" and "cog" had been in no way defective and the motorman had properly adjusted them before releasing the handle, unless the "dog" had been struck a very hard blow or the pin holding it to the floor of the car had broken, and the evidence shows that neither of these things occurred. We think the evidence is clearly sufficient to sustain the finding of negligence upon either of the grounds submitted by the charge.

[2] The fourth assignment of error complains of a paragraph of the charge in which the jury are authorized to find for plaintiff the reasonable value of medical services rendered by the physician who treated her for her injuries, because there is no evidence that the amount charged by the physician, $200, was the reasonable value of such services. The statement submitted under this assignment shows that the physician testified that he made five or six visits to plaintiff, and that the $200 charged plaintiff was a reasonable charge for the treatment she had received from him.

In view of this statement, we cannot understand how appellant's counsel can contend that there is no evidence of the reasonableness of the charge.

[3] The fifth, sixth, and seventh assignments of error complain of the ruling of the court in admitting the testimony of several witnesses introduced by the plaintiff to the effect that there were other kinds of brakes which were superior and more efficient than the "gooseneck" brake.

If it be conceded that this evidence was inadmissible, its admission was harmless, because the court instructed the jury not to consider the allegations in the petition that the brake in question was of an obsolete kind, and further instructed them that the defendant was not required "to use the newest and safest appliances." We do not think the testimony objected to could have possibly affected the findings of the jury upon the issues submitted by the court's charge.

[4, 5] The eighth assignment is as follows:

"The verdict of the jury and the judgment rendered thereon should be set aside because after the jury had retired to consider its verdict the plaintiff, who was weak from having been unnecessarily kept in attendance on the trial, fell in some kind of swoon or faint. She was carried from the courthouse to a carriage, and as she was borne away she was in view of a window to a room in which the jury was deliberating. The attention of the jury was called to the fact that she was being carried to the carriage or automobile, and the jury reached the conclusion that she was very badly injured and erroneously attributed to this circumstance as evidence of a very grave physical condition. The jury was taken deliberating as to their verdict, and thereafterwards members of the jury, impressed by what they had seen, were caused to increase the amount for which they were willing to allow recovery, and because of having seen this members of the jury agreed to a larger amount than they would have agreed on otherwise, and it had the effect on members of the jury to cause them to vote for and to urge a larger verdict, and the result of it was that the jury did, because of this influence, increase the size of the verdict that would have otherwise been rendered."

This assignment presents no sufficient ground for reversing the judgment of the trial court, because neither the assignment nor the statement thereunder raises the question of excessiveness in the verdict. If it be conceded that some of the jurors, because of having seen the plaintiff in the distressed condition stated in the assignment, gave her a larger verdict than they would had they not seen her in this condition, we would not be authorized to disturb the verdict on that account in the absence of a claim and showing that the verdict is excessive. But the assignment cannot be sustained for another reason. On the hearing of the motion for a new trial all of the jurors save one were ex-

amined under oath in open court under the provisions of article 2021, Vernon's Sayles' Civil Statutes. It was agreed on this hearing that neither party should be prejudiced by the failure to obtain the testimony of the absent juror. Two of the jurors testified that they did not see plaintiff as she was being carried from the courthouse to the carriage. These jurors and six others testified positively and unequivocally that they were not influenced in the least in fixing the amount of their verdict by knowledge of the fact that plaintiff had fainted, after the jury had retired from the courtroom, and had been carried away in an unconscious condition, and that in reaching their verdict they considered nothing but the evidence adduced upon the trial. Three other jurors, Hirsch, Boggs, and Rudell, each testified in substance, the first two on direct examination by defendant's counsel, that he saw the plaintiff taken to the carriage in the manner and under the circumstances stated in the assignment, and that the matter was discussed by the jury, and the effect on the witness was to cause him to vote for a larger verdict than he otherwise would. On cross-examination by plaintiff's counsel, Hirsch testified:

"Before I became a juror I swore that I would render a fair and impartial verdict according to the law and the evidence. It is a fact that I had fully seen her condition here in the courtroom before I went to the jury room. I saw her leaning on that table in almost fainting condition before we went out. I heard the doctors' testimony that she was badly hurt; seriously and permanently hurt. I had a full opportunity to observe her condition as she was sitting there in full view of the jury. I said that Mr. Lamonte said she ought to have $30,000 because she was just as badly hurt as she claimed to be; that is what he said. He told somebody that we could see that she was just as badly hurt as she claimed to be in her petition, and that she ought to have the full amount she was suing for. When I saw that girl borne down there I didn't know who was carrying her to the automobile; I just went to the window and peeped out. I stated that the incident was not discussed very much in the jury room; it was slightly discussed. The testimony given on the witness stand was what was mainly discussed in the jury room, in arriving at our verdict we discussed the evidence heard here in this case; that is what controlled me in giving the sum of $12,000—the evidence and testimony I heard in this case."

On cross-examination Boggs testified:

"I said the fact that I saw her carried out there in the automobile influenced my verdict. I heard the testimony in this case and paid attention to it. I knew from the testimony of the doctors that she was very badly and seriously hurt; I believed that was true. I saw her at the table here just before we left for our deliberations in the jury room. I never noticed then that she was practically in a faint before we left for that jury room. I saw her leaning over on the table there, and saw from her appearance that she was in very bad condition, in a really bad condition. It is a fact that when I went in that jury room and arrived at a verdict I did so from the testimony that was given in this case, from the doctor's testimony, and also from her appearance as I saw her in the courtroom here. It is a fact that that is the sole reason I gave her that sum of money we

did give her by that verdict, but if I would not have seen that out there I might not have come up that high. I had seen her condition in the courtroom already, and when I seen her out there it affected me still more because from the way they was carrying her there she seemed to be in a bad condition."

Rudell testified:

"It is a fact that her fainting influenced me to a certain extent. That fainting incident was discussed in the jury room. I didn't see the plaintiff sitting here at the end of that table in a fainting condition during the trial. At times I thought she was in bad condition when she was sitting there, but I didn't see her faint in here. I heard the testimony of doctors here and other witnesses that she had been seriously hurt, and that is what I went by. It is a fact that I was guided by that testimony and controlled by that testimony that I heard here. * * * I was the man that was fighting the rest of the bunch all the time. I didn't want to give her the $12,000; not at the start. I voluntarily did it after awhile. I told them I would meet them half way. There was some up to $25,000, and some was $18,000, and I was way below that, and I told them I would meet them half way, and well, they figured it out then at $12,500, and I told them I wouldn't go higher than $12,000. It is a fact that I am a man of strong determination and strong will power. It is very seldom things can swerve me from what I make up my mind to do if I see things right. I always try to have my own mind about things. It depends on what happens and what occurs as to whether it takes a very unusual thing to carry me away from my own mind. It is a fact that the incident of that woman being carried out there in the automobile influenced me. I will take up for a woman any time when I see a woman in misery or needing help, or anything like that."

We think this testimony authorized the trial court to find that none of the jurors were guilty of improper conduct, and none of them were improperly influenced by the occurrence mentioned in the assignment. The determination of these questions is left by the article of the statutes before cited, to the sound discretion of the trial judge, and we cannot hold, upon the evidence before stated, that the judge abused his discretion, and we are bound by his finding. Kalteyer v. Mitchell, 102 Tex. 393, 117 S. W. 792, 132 Am. St. Rep. 889; Fox v. Railway Co., 186 S. W. 852; Railway Co. v. Gray, 137 S. W. 731; Railway Co. v. Pingenot, 142 S. W. 93; Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606.

The ninth assignment, which predicates error upon the refusal of the court to set aside the verdict because one of the jurors after the retirement of the jury stated to the jury that he was acquainted with plaintiff and knew she was hurt just as bad as she claimed to be, is overruled for the reasons given for overruling the eighth assignment. All of the jurors testified that they only considered the evidence adduced upon the trial in arriving at their verdict.

[6] The tenth assignment of error assails the verdict on the ground that it is excessive.

There was some conflict in the evidence as to the permanency of plaintiff's injuries, but

there is sufficient evidence to sustain the finding that she was suffering from traumatic neurasthenia, from which she would never entirely recover. Upon this evidence we cannot hold that the verdict of the jury is so large as to indicate that it was the result of passion or prejudice, or was caused by any improper motive, and the assignment must be overruled.

From the conclusions before expressed upon the questions presented by appellant's assignments of error it follows that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.