BELT et al. v. TEXAS CO. et al.

No. 5752.

Court of Civil Appeals of Texas. Amarillo.

April 28, 1947.

Rehearing Denied Sept. 22, 1947.

E. L. Klett, of Lubbock, Tex., and Allen Wight, of Dallas, for appellants.

John E. Kilgore, of Dallas, Lawrence Tarlton and H. S. Garrett, both of Fort Worth, Bradley & Wilson and Crenshaw, Dupree & Milam, all of Lubbock, for appellees.

STOKES, Justice.

Prior to the year 1924, in a partition of the lands of the C. C. Slaughter Cattle Company, Bob Slaughter was awarded approximately 16,000 acres located in Hockley County. In 1924 he negotiated a loan in the sum of $100,000 with the Dallas Joint Stock Land Bank. The bank was limited in a single loan to the sum of $50,000 and, in order to procure the loan in the sum desired, Bob Slaughter executed a deed of trust on the north half of the land to the Dallas Joint Stock Land Bank to secure his own note for $50,000 and conveyed the south half of the tract of 16,000 acres to his brother-in-law and sister, Dr. George T. Veal and his wife, Minnie Slaughter Veal. As consideration for the conveyance, the Veals executed a note in the sum of $50,000 payable to Bob Slaughter, who retained a vendor's lien on the land so conveyed and he immediately assigned the note and lien to the Dallas Joint Stock Land Bank. The bank thereupon loaned to Dr. and Mrs. Veal $50,000 upon the south half of the land and a short time thereafter Dr. and Mrs. Veal reconveyed the south half of the tract to Bob Slaughter, who assumed the $50,000 note that had been executed by the Veals. Bob Slaughter then had the land surveyed and platted into ninety-eight separate tracts ranging in area from approximately 119 acres to approximately 183 acres, and, on the 16th of February, 1925, he caused a plat thereof to be filed in the office of the County Clerk of Hockley County and designated the entire 16,000 acres as the Bob Slaughter Block. He then began selling the subdivided tracts to settlers for relatively small cash payments, the assumption of approximately $6.50 per acre of the indebtedness held by the Dallas Joint Stock Land Bank, and usually one note for a substantial amount payable ten years after date, and a series of smaller notes payable annually, all bearing interest at a stipulated rate and secured by vendor's liens. The series of smaller notes was payable out of the proceeds of one-third of the cotton raised on the land each year and, as additional security for them, crop mortgages were executed by the purchasers. In many of the deeds conveying these tracts to farmers and settlers, one-sixteenth of the oil, gas and minerals was retained by Bob Slaughter as a nonparticipating royalty.

George T. Veal and his wife were the owners of fifty-five per cent of the capital stock of Slaughter Land & Cattle Company, a corporation, incorporated under the

laws of Arizona on April 14, 1913, with an authorized capital stock of $250,000. The corporation owned a ranch near Moctezuma in the State of Sonora, Republic of Mexico, consisting of approximately 200,000 acres, though the area and extent of the ranch is somewhat uncertain.

On January 2, 1932, Bob Slaughter and Dr. George T. Veal and his wife, Minnie Slaughter Veal, entered into a written contract by the terms of which Slaughter sold and agreed to convey to the Veals all of the tracts and subdivisions of the Bob Slaughter Block in Hockley County that had not theretofore been sold to settlers, in consideration of the assignment to him of 525 shares of the capital stock of the Slaughter Land & Cattle Company. The shares of stock were designated as fifty-five per cent of the capital stock of the corporation and were valued in the contract at $104,500. Bob Slaughter then owned approximately 2,400 acres of the Bob Slaughter Block, encumbered with the indebtedness and liens held by the Dallas Joint Stock Land Bank of approximately $6 per acre, and the Hockley County land was stipulated in the contract to be of the value of $18 per acre, after deducting the $6 per acre covered by the liens to the Dallas Joint Stock Land Bank, making a total of $41,760. In addition to the Hockley County land, Slaughter assigned to Dr. and Mrs. Veal second lien notes of the aggregate face value of $78,253.83, secured by vendor's liens on tracts in the Bob Slaughter Block that had been sold by him to various purchasers. These, being second lien notes, were appraised by stipulation in the contract at Eighty Cents on the dollar of par value, making an appraised value of $62,602.66. This left a small balance of $137.34, which Slaughter agreed to pay in cash, aggregating $104,-500, the equivalent of the agreed value of the ranch in Mexico.

On the same day a deed was duly executed by Bob Slaughter conveying the Hockley County land to the Veals reciting a consideration of $41,760.00 "in hand paid by George T. Veal and wife, Minnie Slaughter Veal, the receipt of which is hereby acknowledged." The second lien notes were duly assigned to the Veals by Slaughter and the $137.34 was paid in cash.

Prior to the transactions above detailed, on May 29, 1931, Bob Slaughter had executed and delivered to appellant, W. D. Belt, Jr., his promissory note in the principal sum of $1,605.61, payable six months after date, bearing interest at the rate of eight per cent per annum and containing the usual attorney's fee clause. In January, 1934, the note not having been paid, Belt instituted suit thereon in the District Court of Lubbock County and on November 23, 1934, judgment was entered against Slaughter for the sum of $2,260.68, the aggregate of the principal, interest and attorney's fees due thereon. On December 26, 1934, an abstract of the judgment was issued, filed for record and duly recorded in Hockley County on the 28th of December, 1934. On July 30, 1935, an alias execution was issued on the judgment, under which the sheriff of Hockley County levied upon a number of the tracts in the Bob Slaughter Block, aggregating approximately 2,400 acres, and on September 3, 1935, at public outcry, he sold to W. D. Belt, Jr., "all of the right, title and interest of Bob Slaughter" in the land upon his bid of $500, which was credited on the judgment, and the sheriff accordingly executed and delivered to Belt a sheriff's deed which was filed for record in Hockley County February 11, 1936.

On February 26, 1936, George T. Veal and wife, Minnie Slaughter Veal, executed and delivered to appellee, The Texas Company, an oil and gas lease on seven full tracts and portions of six others, being parts of the land here involved, aggregating 2,025.6 acres, for which The Texas Company paid them a bonus of $2,025.60. The lease contained a provision that the land so leased and other lands in the community upon which the lessee might obtain similar leases were to constitute a unitized block, consisting in the aggregate of approximately 6,000 acres, and for the sharing by all lessors in the unitized block of royalties on production from any and all lands in the unitized block.

On the 5th of November, 1937, Sue Alice Slaughter, wife of R. L. Slaughter, Jr., who was a nephew of Mrs. Veal and son of

Bob Slaughter, purchased from Dr. and Mrs. Veal approximately 3,859 acres of the Bob Slaughter Block, consisting of eighteen subdivisions and parts of thirteen others, together with certain interests in oil and gas reservations and royalties which the Veals had retained in sales theretofore made by them of a number of other subdivisions. The consideration recited in this deed was $16,274.47 paid in cash by the appellee, Sid W. Richardson, to the Dallas Joint Stock Land Bank, and the assumption by Sue Alice Slaughter of the balance due that bank upon the loans held by it against Bob Slaughter and the Veals; the further consideration of "the love and affection we bear our niece, the grantee herein"; and the still further consideration of a vendor's lien note executed by Sue Alice Slaughter in the sum of $32,199.98, payable to the Veals one year after date with interest at seven per centum per annum. To secure the payment of this note, a vendor's lien was retained in the deed and a deed of trust executed by the grantee conveying the land to W. H. Flippen as trustee. The note was also signed by R. L. Slaughter, Jr., pro forma and without personal liability. The deed recited that the conveyance was made subject to all outstanding liens, which were assumed by the grantee, and subject to all existing oil and gas leases or other conveyances theretofore made by the grantors or their predecessor in title.

While the negotiations were pending for the purchase, and in order to procure from Sid W. Richardson the money with which to make the cash payment, Sue Alice Slaughter procured Dr. and Mrs. Veal to execute and deliver to Richardson an oil and gas lease on a number of subdivisions which, in their negotiations, they contemplated were to be conveyed to him, including Tracts 25, 47 and East Half of 55, and Sue Alice Slaughter and her husband, R. L. Slaughter, Jr., conveyed to Richardson certain other oil and gas interests in land not involved in this suit. On the 24th of August, 1940, Richardson assigned and conveyed to Howell E. Smith, as trustee for his daughter, Nancy Ann Smith, an undivided one-fourth interest in and to the oil, gas and minerals in Tract 47.

In April, 1939, and August, 1940, the appellee, Sabine Royalty Corporation, purchased from R. L. Slaughter, Jr., J. L. McMahon and W. H. Flippen certain royalty interests in ten subdivisions of the Bob Slaughter Block at a price of approximately $90 per acre. The appellees, therefore, deraigned their title through Dr. and Mrs. Veal and the deed of January 2, 1932, executed by Bob Slaughter, in which he conveyed the land to them. All, or parts, of the lands and interests procured by each of them are involved in this suit and are claimed by the appellants under the sheriff's deed of September 3, 1935, conveying the land to W. D. Belt, Jr.

On April 21, 1939, appellant, W. D. Belt, Jr., filed a suit, Number 810, against the appellees, Sue Alice Slaughter and her husband, R. L. Slaughter, Jr. On January 20, 1942, he filed a suit, Number 1028, against Sid W. Richardson, Howell E. Smith, Trustee and others, and, on the same day, he filed another suit against Sabine Royalty Corporation, Number 1030. On April 19, 1944, he filed a suit against the Texas Company, Number 1238, all in the District Court of Hockley County, each suit being in the form of trespass to try title and for possession of the 2,400 acres involved in this suit. On April 30, 1945, the court entered an order consolidating all four of the pending cases under Number 1238 and, before the case was tried, Mrs. Alma Simmons Belt Killen and her husband, D. L. Killen, intervened, claiming an interest in the land for Mrs. Killen, who was the wife of W. D. Belt, Jr., when the sheriff's deed was executed.

The consolidated cause was submitted to a jury upon 115 special issues, all of which were resolved by the jury in favor of the appellees. Judgment was entered in accordance therewith, denying the appellants any recovery and granting relief to the appellees under cross actions to remove cloud from title to the various tracts of land and oil, gas and mineral interests claimed by them respectively. A motion for a new trial was duly filed, presented to the court and overruled; whereupon, appellants duly excepted and gave notice of appeal to this court.

The appellants are W. D. Belt, Jr., and his former wife, Alma Simmons Killen, joined by her husband, and the appellees are R. L. Slaughter, Jr., and his wife, Sue Alice Slaughter, The Texas Company, Sid W. Richardson, Howell E. Smith, Trustee, and Sabine Royalty Corporation.

Appellants present the appeal in this court upon fifty-eight assignments of error; but the view we take of the case and the conclusions we have reached concerning it make it necessary for us to discuss only a portion of them and even those we do not deem it necessary to discuss in detail. Appellants contend first, that the deed executed by Bob Slaughter on January 2, 1932, by which he conveyed to Dr. and Mrs. Veal the 2,400 acres of land here involved, was made for the purpose of evading his obligations, in fraud of his creditors, and was therefore void as to them under the provisions of Article 3996, Revised Civil Statutes of 1925, and that the finding of the jury to the contrary was without evidence to support it, or at least, was so overwhelmingly against the weight and preponderance of the evidence as manifestly to be wrong; secondly, that the finding of the jury to the effect that Dr. and Mrs. Veal did not have knowledge or notice of the fraudulent intent of Bob Slaughter in executing the deed was contrary to the overwhelming weight of the evidence; thirdly, that the numerous "badges of fraud" shown by the evidence overwhelmingly established the fact that Dr. and Mrs. Veal knew of the fraudulent intent of Bob Slaughter, or at least were sufficient to put them upon notice thereof; fourthly, that the court erred in overruling their motion for a new trial because of certain inflammatory statements made in their arguments to the jury by counsel for the appellees; fifthly, that their motion for a new trial should have been granted because of misconduct of the jury; sixthly, that the court erred in submitting certain instructions in its charge to the jury; and, seventhly, that the court erred in refusing to give to the jury certain special charges requested by them.

Appellants do not stress the contention that any substantial direct, or positive, evidence was adduced by them which established fraud on the part of Bob Slaughter in executing the deed of January 2, 1932, by which he conveyed the land to his brother-in-law and sister, Dr. and Mrs. Veal, nor such evidence that the Veals had actual knowledge of any such fraudulent intent of Bob Slaughter, if such there was, but they contend that the evidence presented such a formidable array of what the law terms "badges of fraud" as overwhelmingly to establish their allegations of fraud, and the knowledge of the Veals thereof, or, at least, to charge them with such knowledge in spite of their denials and the controverting evidence adduced by the appellees. They assert that they established seventeen positive badges of fraud and that in the face of such an array, the jury was not warranted in returning a verdict against them, nor was the court warranted in entering an adverse judgment. They contend that, at the time the deed was executed, Bob Slaughter was hopelessly insolvent; that the ranch in Mexico was of no value, or at least its value was wholly inadequate as a consideration for the conveyance of the Hockley County land; that Slaughter retained possession of the Hockley County land and that the evidence was sufficient to establish a secret reservation by him of the rents therefrom; that he transferred all of his property in this state for property located in a foreign country, thus placing it beyond the reach of his creditors; that Mrs. Veal was his sister and, therefore, it was a transaction between him and his relatives; that the consideration was stated in the deed as cash in hand paid when the real consideration was the exchange of property; that the transaction was negotiated in secrecy and consummated in haste; that Bob Slaughter was an old and broken down man and could not have desired to own the ranch in Mexico or have had any practical use for it; that Dr. and Mrs. Veal never made any claim to the Hockley County land after it was conveyed to them, nor did they take possession and assume the operation or management of it; and that they refused, or at least failed, promptly to pay the taxes on the Hockley County land as they became due, as was their universal

custom as to other property owned by them.

As to the question of Bob Slaughter's insolvency at the time he conveyed the land to the Veals, the testimony indicates strongly that, if he had been required immediately to place all of his property upon the market and dispose of it, the proceeds would probably have been insufficient to discharge all of his obligations. According to the witnesses who were familar with the general market value of lands in the vicinity, it would have been difficult, if not impossible, to dispose of the land at any price at that time. The witnesses stated that on January 2, 1932, when the deed to the Veals was executed, the general economic depression was in its lowest depths and no land was being sold. One of appellants' witnesses stated he knew of a few owners of land who had "sort of traded out and got a little equity out of it," and that "just like everything else, there was nothing selling then." Others of appellants' witnesses testified that land which was already under mortgage was practically unsalable at that time. They said that, in their judgment, the land was worth $30 an acre, but their opinions were based upon the fact that it was land and that it would be in existence indefinitely and, therefore, had a substantial intrinsic value. Another of appellants' witnesses stated there was no market for land that was already under mortgage. The record shows that some of the lands in the Bob Slaughter Block had sold for as much as $45.00 per acre prior to the depression. All of it was covered by the deeds of trust held by the Dallas Joint Stock Land Bank and Bob Slaughter had been unable promptly to pay some of the taxes due thereon. Bob Slaughter died in 1938, but letters of his introduced in evidence showed that prior to the conveyance of the land to the Veals he had been having great difficulty in meeting the semi-annual payments on the loans and that he was greatly worried about them. It was under these conditions that the exchange was negotiated and in making it, Slaughter obtained a large ranch in the Republic of Mexico which was free of encumbrance, or practically so, and which, according to the testimony of a number of witnesses, had a very substantial value.

As to the inadequacy of the consideration, that is, the value of the Mexico ranch, there was evidence that it had little or no practical value at that time, nor any substantial monetary value. The cattle market was at about the lowest point it has ever reached, the market value ranging around Four dollars per cwt. The Smoot-Hawley Tariff Act, 19 U.S.C.A. § 1001 et seq., had been passed by the Congress in 1930 and it levied a tax of Three Dollars per cwt. on cattle shipped into this country from Mexico. There was practically no market for cattle in Mexico and therefore, as a cattle ranch at that particular time, it is evident that no substantial returns could have been realized from it. Witnesses who operated cattle ranches and cattle businesses generally in Arizona and the section of this country adjoining that portion of the Republic of Mexico where the ranch was located, and who were acquainted with the ranch and its adaptability as such, testified, however, that in 1932 it was worth two dollars per acre. Some of them placed its aggregate value at $200,000 to $250,000 and one witness placed it at from $250,000 to $300,000. The record is not clear as to whether or not it was encumbered but it contains an intimation that it might have been encumbered for $25,000. In view of this testimony and the conditions revealed by it, the jury was, in our opinion, amply warranted in concluding that the exchange of lands between Bob Slaughter and the Veals was based upon an adequate consideration.

As to the matter of rents, revenues and possession, we do not find anything in the testimony which compels the conclusion that the contract of exchange contemplated a retention by Bob Slaughter of possession of the Hockley County land or the reservation of rentals from it. After he conveyed the land to the Veals, Bob Slaughter collected from tenants a portion of the rentals and he negotiated contracts of rental with tenants who thereafter cultivated some of the subdivisions, but it is shown that he had some connection with the Lone Star Land Company, a corporation, which acted as the agent of Dr.

and Mrs. Veal in collecting rentals and notes and performed other duties for them with respect to the various tracts of land. There is no showing that he ever collected any rentals and retained them or claimed them as his own.. Moreover, Bob Slaughter was personally liable for some $80,000 balance owing to the Dallas Joint Stock Land Bank on its first liens, and in view of the distressing economic conditions prevailing with respect to the ranch in Mexico, his activities in attending to matters pertaining to the Hockley County land are not conclusive of the contentions here made by appellants that he retained possession and had a secret agreement that he would receive the rents and other revenue from the Hockley County land. The testimony is not full and complete as to the manner in which the rents and revenues were handled, but it is shown that on at least one occasion 128 bales of cotton were sold by Bob Slaughter and he delivered the remittance therefor to the Lone Star Land Company, who immediately transmitted it to the Dallas Joint Stock Land Bank as a payment upon the notes held by it, for which both Slaughter and the Veals were liable.

One of the appellants' witnesses testified that in September, 1937, he visited in the home of Dr. and Mrs. Veal on their ranch near El Paso and that he overheard a telephone conversation between Mrs. Veal and R. L. Slaughter, Jr., and a conversation with Dr. Veal after the close of the telephone conversation. He said the gist of these conversations was that the Veals were to convey the Hockley County property to Sue Alice Slaughter pursuant to an agreement which the Veals had with Bob Slaughter at the time of the conveyance of January 2, 1932, by which he conveyed the Hockley County land to the Veals, and that the conveyance to Sue Alice Slaughter was to be made to her because neither Bob Slaughter nor R. L. Slaughter, Jr., was in such financial condition as that they could safely hold the title. The deposition of this witness was taken after the death of Dr. Veal, but Mrs. Veal denied positively that any such conversation ever took place or that any such arrangement was ever made with Bob Slaughter.

As opposed to the testimony and circumstances adduced by the appellants, both Dr. Veal and Mrs. Veal testified positively by deposition that the conveyance to them of the Hockley County land was not made to hinder, defraud or delay the creditors of Bob Slaughter nor to conceal his assets, and that after the conveyance was made they were the owners of the land and claimed it as their own property. They said in effect that, at the time of making the trade, the only creditors of Bob Slaughter known to them were themselves, the Dallas Joint Stock Land Bank and the holders of certain land notes which were secured by liens on lands considered to be of value in excess of the debts for which they were held as security. The evidence further showed that, after the conveyance, the Veals exercised the ordinary acts of ownership, although such acts were usually performed through or by their agents. While the taxes for some of the years, particularly from 1932 to 1936, were not paid until they became delinquent, the land was rendered for taxes by the Veals, or by their agents for them and in their names, and they were paid by the Veals after they became delinquent. It was further shown that they collected more than $24,000 in revenues of various kinds from the property; that either in person or through their agents, they rented various tracts of the land to farmers; and they sold a number of the subdivisions to settlers, executed the deeds and received the consideration. In some instances it became necessary to repossess certain tracts and cancel the second lien notes held by them and, in other instances, they gave liens on portions of the land to secure notes and indebtedness owed by them. Finally, in 1937, they sold to Sue Alice Slaughter all of the land that had not theretofore been disposed of, for which she paid them a valuable consideration and, although Bob Slaughter was living at that time, there is no evidence that he received or demanded any portion of it. It is true that oil had then been discovered on a portion of the land by The Texas Company under the unitized lease held by it and the land was probably of value much greater than the amount paid to them as consider-

ation by Sue Alice Slaughter, but the Veals were aged people at that time and were quite wealthy. According to the testimony, both of them constantly worried about the indebtedness to the Dallas Joint Stock Land Bank and other debts of large amounts for which they were responsible, and Mrs. Veal testified that both she and Dr. Veal were anxious to be relieved of responsibility for them. We find nothing in the testimony or the circumstances urged by appellants as "badges of fraud" which establishes conclusively that the deed of January 2, 1932 was made by Bob Slaughter and accepted by the Veals in fraud of Slaughter's creditors. At most, it shows strong indications of fraud, but there is nothing in any of it that could not be refuted and overcome by testimony to the contrary. The testimony and the circumstances presented questions of fact for the jury and were all before the jury when it rendered its verdict. Certainly there was ample evidence to warrant the jury in concluding that the deed was not executed by Slaughter nor received by the Veals in fraud of Slaughter's creditors. The evidence is undisputed that Sue Alice Slaughter procured Sid W. Richardson to advance something over $16,000 to pay the final balance due on one of the notes held by the Dallas Joint Stock Land Bank and that her note in excess of $32,000, executed and delivered to the Veals as part of the consideration, was bona fide and was afterwards paid off and fully discharged by her and her husband. Thus it was shown that Sue Alice Slaughter paid a valuable consideration for the land conveyed to her and there is no testimony which indicates the land was given or conveyed to her in consummation of any secret agreement between the Veals and Bob Slaughter at the time he conveyed the land to them.

■ As we have already shown, Dr. and Mrs. Veal paid a valuable consideration for the conveyance of the land to them by Bob Slaughter and it has long been the rule in this state, established by many decisions of our courts, that in order to bring a transaction of the nature of that here involved in conflict with Article 3996, it is necessary to establish by competent evidence, and secure a finding by the court or jury, not only that the grantor executed the deed with intent to hinder, delay or defraud his creditors, but that the grantee knew of such fraudulent intent, or was in the possession of facts and circumstances sufficient to put him on notice of it and require of him a reasonable investigation. Martell v. Somers, 26 Tex. 551; Sanger et al. v. Colbert, 84 Tex. 668, 19 S.W. 863; Matador Land & Cattle Co. v. Cooper, 39 Tex.Civ.App. 99, 87 S.W. 235; Chauncey v. Gambill et al., Tex.Civ.App., 126 S.W.2d 775; Texas Life Ins. Co. v. Goldberg, Tex.Civ.App., 184 S.W.2d 333.

■ Granting that Bob Slaughter was insolvent and that, at the time he conveyed the land to the Veals, he could not have paid his debts, still the testimony fails to establish any positive intention on his part to defraud his creditors. He owned land in Lynn, Borden and Hale Counties and a large number of second vendor's lien notes which he delivered to Dr. Veal as a pledge to protect the latter against liability on the note executed by Slaughter to the Dallas Joint Stock Land Bank. While the circumstances presented by appellants constitute what the courts have in various cases designated as "badges of fraud", there was ample evidence of a positive and substantial nature to warrant the jury in finding that if such fraud existed, Dr. and Mrs. Veal did not have knowledge of it. It is hardly necessary to cite authority for the proposition that, under our system, the appellate courts are not warranted in disturbing or reversing the verdicts of juries where there is evidence of probative force and of a substantial nature to support them. We are not in accord with appellants in their contention that the findings of the jury, to the effect that the deed of January 2, 1932, was not made and accepted with the intent to hinder, delay or defraud the creditors of Bob Slaughter, were without substantial evidence to support them, or were so overwhelmingly against the weight and preponderance of the evidence as clearly to be wrong and should, therefore, not be permitted to stand. The assignments of error assailing the verdict and judgment upon that ground will, therefore, be overruled.

■ The next contention of appellants which we shall consider is their complaint of certain assertions and statements made by counsel for some of the appellees in their arguments to the jury. The assignments of error pertaining to these complaints are urged with much force and earnestness by appellants and we have given all of them thorough consideration. In the hearing on the motion for a new trial, these matters were presented to the trial court and considered by it. Some of the statements complained of were objected to at the time they were made and the objections were sustained and proper instructions given to the jury by the court, and the counsel making them immediately apologized, withdrew the statements, and joined the court in the request that the jury disregard them. Others were not objected to at the time but were presented to the court for the first time in the motion for a new trial. We do not deem it necessary to encumber this opinion with a detailed statement of the arguments complained of. Granting that some of them were improper, in our opinion none of them was of such a nature as that any damaging effect which it might have caused could not have been removed by proper instructions of the court. In presenting the matter upon the hearing of the motion for a new trial, appellants did not show any actual injury resulting from the arguments and assertions complained of and the trial court affirmatively found that no injury resulted to appellants. The rule is well established that, where the argument is of such a nature that, if objection is made at the time, so that counsel may offer an explanation or make correction and the improper argument thereby rendered harmless by proper instructions of the court or, if it is of such a nature that a withdrawal by counsel or the instruction of the court to disregard it will eliminate the error and render the argument harmless, the complaining party must object to the argument at the time it is made and request the court to instruct the jury not to consider it. Under such circumstances, failure to do so effects a waiver of the error. The matter of improper argument is generally a question addressed to the sound discretion of the trial court and its

action will not be disturbed by the appellate court unless it clearly appears that the trial court abused its discretion or the argument was of such a nature as that proper instructions to the jury would not eliminate any damaging effect that might have resulted from it. We do not believe that any of the argument complained of was of that nature, and the assignments of error pertaining to that matter will therefore, be overruled. Patterson v. Fuller, Tex.Civ.App., 110 S.W.2d 1230; Ramirez v. Acker, 134 Tex. 647, 138 S.W. 2d 1054; Howard v. Sears, Tex.Civ.App., 196 S.W.2d 105; Three States Tel. Co. v. Kirkwood, Tex.Civ.App., 61 S.W.2d 568.

The next contention presented by appellants, and listed by us as their fifth contention, pertains to alleged misconduct of the jury. After the trial was completed and before the motion for a new trial was presented, one of the jurors made an affidavit to the effect that in the jury room, while the jury was considering its verdict, one of the jurors said in substance that lawyers "could not make him believe Bob Slaughter wasn't on the up and up". That at one time he had owed Bob Slaughter some land notes and that he went to see Slaughter about carrying the notes and that Slaughter replied he had about all he could carry but that he would put the juror on his books and carry him too. The juror who made the affidavit testified upon the hearing of the motion for a new trial and he materially modified the statement contained in his affidavit by saying that in the jury room, and speaking of the matter contained in the affidavit, the other juror said they "hadn't" made him, or "couldn't" make him, believe, etc. He did not remember which word had been used by the other juror.

■■ Further complaint is made of the conduct of the jury with reference to answering the special issues, the contention being that the jurors agreed to answer the first seventeen of the issues alike in order to avoid contradictions in the verdict. Upon the hearing of the motion for a new trial, one of the jurors testified that he heard such a statement made by some of the others. There was no testimony to the effect that the jurors bound themselves in

advance by an agreement to answer any of the special issues in a certain way nor that the answer to each of the special issues was not the verdict of each member of the jury. The trial court considered this matter on the hearing of the motion for a new trial and filed findings of fact in which it found that the evidence failed to sustain the allegations concerning misconduct of the jury in regard to each of these matters. The trial judge is obviously in better position to determine their substance and effect than is an appellate court and for that, as well as other reasons, the rule has been well established that questions concerning the conduct of the jury should be left largely to the discretion of the trial court. If the jury was guilty of misconduct, in our opinion, it was not of such a nature as to constitute reversible error and we are not disposed to disturb the action of the court below in overruling appellants' contentions in that regard. Houston Electric Co. v. Pearce, Tex.Civ. App., 192 S.W. 558; Turner v. Turner, Tex.Civ.App., 195 S.W. 326.

The two remaining contentions of appellants have reference to certain instructions contained in the charge of the court and the refusal of the court to give to the jury certain special charges requested by the appellants. A detailed discussion of these would unduly extend this opinion. Suffice it to say that we have carefully considered the assignments of error in which they are presented, together with the argument and authorities presented by the appellants and, in our opinion, they do not present reversible error.

There are a number of issues in the case that we have not discussed. They pertain principally to questions of the three and ten years statutes of limitation and adverse possession and to the question of priority of rights procured by appellant Belt and one Gau under abstracts of judgments and executions issued thereon, Gau having assigned his judgment to appellee, The · Texas Company. These and other questions presented by the record are material only in the event it is found that the deed executed by Bob Slaughter on January 2, 1932, in which he conveyed to Dr. and Mrs. Veal the land in controversy, was made for the purpose of defrauding Slaughter's creditors and was void as to the latter. Having concluded that the deed was not of that character, the issues we have not discussed become immaterial and we have not deemed it necessary to discuss them. ·

We have carefully considered all of the assignments of error, arguments and many of the authorities cited by the appellants and, in our opinion, none of the assignments reveals reversible error. The judgment of the court below will, therefore, be affirmed.