### TEXAS & N. O. R. CO. v. WILKERSON et al.

#### No. 4850.

Court of Civil Appeals of Texas. Beaumont.

July 16, 1953.

Rehearing Denied Sept. 16, 1953.

Baker, Botts, Andrews & Parish, Houston, Ross Hightower, Livingston, James E. Faulkner, Cold Springs, for appellant.

Helm & Jones, Houston, Alvis Ellisor, Cleveland, H. S. Lilley, Cold Springs, for appellees.

PER CURIAM.

This is an appeal from a judgment in the district court of San Jacinto County in favor of Mrs. Lillie Mae Wilkerson and her husband, Reuben Wilkerson, appellees, against the Texas and New Orleans Railroad Company, appellant, in a personal injury suit.

On June 14, 1950 the appellees filed their original petition against the appellant alleging that Mrs. Wilkerson on May 13, 1950 was riding as a passenger on the railroad train of the appellant from Cleveland, Texas to Shepherd, Texas, and that when the train stopped and they started to alight therefrom the train thereupon gave a sudden and violent lurch and caused Mrs. Wilkerson to be thrown with great force and

violence against the edge of the restroom and on to the floor; that as a result thereof Mrs. Wilkerson was caused to receive serious bodily injuries and permanent physical disabilities. It was further alleged that the operators of the train were negligent in failing to give the appellees any warning of the movement of the train after it had been brought to a stop, in permitting the train to give an unusual and violent jerk, in failing to keep the train in a stationary position until they had a reasonable opportunity to detrain; and in failing to allow them proper time to detrain before starting the train again. Thereafter on July 13, 1951 appellees filed their amended original petition pleading, in addition to matters alleged in the original amended petition, the doctrine of res ipsa loquitur. Thereafter on November 8, 1951, shortly before the trial of the lawsuit began, a second original amended petition was filed, alleging in addition to the matters already alleged the additional ground of negligence that the appellant permitted the train to be in use with defective equipment, alleging in more detail the injuries and disabilities of Mrs. Wilkerson and alleging damages in the sum of $100,000. The first petition alleged damages of $50,-000, the second $75,000. Appellant answered by general denial, plea of contributory negligence on the part of appellees, that the matters complained of were proximately caused solely by pre-existing or subsequent disease or bodily condition of Mrs. Wilkerson and also that the matters complained of were the result of an unavoidable accident.

On November 23, 1951 the appellant filed its application to change the venue of the suit from San Jacinto County, alleging that the appellant could not receive a fair and impartial trial by jury in San Jacinto County because of the existence of facts alleged in the application for change of venue. It also alleged that since the date of Mrs. Wilkerson's alleged injuries and after the filing of the suit petitions were circulated in San Jacinto County soliciting contributions for the care and upkeep of the Wilkerson family in Coley Creek and Shepherd, and that many inhabitants of San Jacinto County in fact had contributed to the welfare and upkeep of the Wilkerson family; that churches and church organizations in that vicinity had made numerous contributions to the Wilkerson family since the date of the accident and the date of the filing of the suit, all of which caused an overwhelming feeling of sympathy on the part of the people who lived in those areas; that since the filing of the suit the Wilkersons had lived in the Coley Creek area and since then have moved near Shepherd to a house located on the main highway between Cold Springs, Camilla, Cleveland and Stephens Creek and that during the months of the year when the weather permits Mrs. Wilkerson has spent much time on the front porch of her house upon the said highway in a wheelchair where members of the community and other residents of the county passing along the highway could and did observe her condition in such a manner as to arouse overwhelming sympathy for her cause; that because of the wide dissemination of information about the plight of the Wilkersons and sympathy on the part of the residents of San Jacinto County for Mrs. Wilkerson it was impossible to obtain a fair and impartial jury panel; that because of these matters there existed in San Jacinto County so great a prejudice against the appellant that it could not obtain a fair and impartial trial. The trial court heard the evidence on the application for change of venue and after a hearing overruled such application.

Thereafter the appellant filed a motion to quash the jury panel, alleging in connection therewith various irregularities in the matter of securing a list of petit jurors available for the week of November 28, 1951 when the case was to be tried. The trial court heard the evidence on the motion and thereafter overruled it.

The case was tried to a jury and at the conclusion of the testimony in behalf of the appellees the appellant filed its motion for instructed verdict alleging, among other matters, that there was no evidence that whatever accident may have occurred resulted in the injuries or disabilities of Mrs.

Wilkerson, and that the only testimony in the record upon the question of whether the occurrence made the basis of the suit caused her physical condition was speculation and conjecture. This motion was overruled. At the conclusion of all the evidence the appellant again filed a motion for instructed verdict alleging in more detail the insufficiency of the evidence in various particulars. This motion was overruled.

The charge of the court submitted the following Special Issues to the jury. The answers of the jury by its verdict are also shown immediately after the various Special Issues:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that the train moved after it had been brought to a stop immediately before the occurrence, if any, made the basis of this suit?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 1 'yes', and only in that event, then answer:

"Special Issue No. 2

"Do you find from a preponderance of the evidence that defendant railway company failed to give your plaintiffs any warning of the movement of the train, after it had been brought to a stop immediately, if you have so found, before the occurrence made the basis of this suit?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 2 'yes', and only in that event, then answer:

"Special Issue No. 3

"Do you find from a preponderance of the evidence that such failure, if any, to give your plaintiffs any warning of the movement of the train, after it had been stopped,

if you have so found, was negligence as that term is defined to you herein?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 3 'yes', and only in that event, then answer:

"Special Issue No. 4

"Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of the injuries, if any, suffered by Mrs. Wilkerson on May 13, 1950?

"Answer: 'yes' or 'no'.

"Yes.

"Special Issue No. 5

"Do you find from a preponderance of the evidence that the train was permitted to give an unusual and violent jerk on the occasion made the basis of this suit?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 5 'yes', and only in that event, then answer:

"Special Issue No. 6

"Do you find from a preponderance of the evidence that in permitting the train to give an unusual and violent jerk, if you have so found, was negligence, as that term is defined to you herein?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 6 'yes', and only in that event, then answer:

"Special Issue No. 7

"Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of the injuries, if any,

suffered by Mrs. Wilkerson on May 13, 1950?

"Answer: 'yes' or 'no'.

"Yes.

"Special Issue No. 8

"Do you find from a preponderance of the evidence that at the time and on the occasion in question the plaintiff, Mrs. Lillie Mae Wilkerson, started to get off the train before it had come to a complete stop?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 8 'yes', and only in that event, then answer:

"Special Issue No. 9

"Do you find from a preponderance of the evidence that such act, if any, on the part of Mrs. Lillie Mae Wilkerson, was a failure to use the degree of care that would have been exercised by a person of ordinary prudence under the same or similar circumstances?

"Answer: 'yes' or 'no'.

"If you have answered the preceding Special Issue No. 9 'yes', and only in that event, then answer:

"Special Issue No. 10

"Do you find from a preponderance of the evidence that such failure, if any, on the part of Mrs. Lillie Mae Wilkerson was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 11

"Do you find from a preponderance of the evidence that at the time and on the occasion in question, Mrs. Lillie Mae Wilkerson, plaintiff, failed to support herself in such a way as to prevent her fall?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 11 'yes', and only in that event, then answer:

"Special Issue No. 12

"Do you find from a preponderance of the evidence that such failure, if any, on the part of Mrs. Lillie Mae Wilkerson was negligence as that term has been defined to you herein?

"Answer: 'yes' or 'no'.

"If you have answered the preceding Special Issue No. 12 'yes', and only in that event, then answer:

"Special Issue No. 13

"Do you find from a preponderance of the evidence that such negligence was a proximate result of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 14

"Do you find from a preponderance of the evidence that at the time and on the occasion in question the plaintiff, Mrs. Lillie Mae Wilkerson, failed to keep such a lookout for any movement of the train as would have been kept by a reasonably prudent person under the same or similar circumstances?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 14 'yes', and only in that event, then answer:

"Special Issue No. 15

"Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 16

"Do you find from a preponderance of the evidence that at the time and on the

occasion in question, Mrs. Lillie Mae Wilkerson stumbled in the vestibule of the train as she was getting off?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 16 'yes', and only in that event, then answer:

"Special Issue No. 17

"Do you find from a preponderance of the evidence that such act, if any, on the part of Mrs. Lillie Mae Wilkerson was negligence as that term is defined herein?

· "Answer: 'yes' or 'no'.

"If you have answered the preceding Special Issue No. 17 'yes', and only in that event, then answer:

"Special Issue No. 18

"Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 19

"Do you find from a preponderance of the evidence that at the time and on the occasion in question Ruben Wilkerson failed to keep such lookout for the safety of his wife as would have been kept by a person of ordinary prudence under the same or similar circumstances?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 19 'yes', and only in that event, then answer:

'Special Issue No. 20

"Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 21

"Do you find from a preponderance of the evidence that at the time and on the occasion in question Ruben Wilkerson failed to keep such a lookout for any movement of the train as would have been kept by a person of ordinary prudence under the same or similar circumstances?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 21 'yes', and only in that event, then answer:

"Special Issue No. 22

"Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 23

"Do you find from a preponderance of the evidence that at the time and on the occasion in question Ruben Wilkerson failed to assist his wife as she started to get off the train?

"Answer: 'yes' or 'no'.

"No.

"If you have answered Special Issue No. 23 'yes', and only in that event, then answer:

"Special Issue No. 24

"Do you find from a preponderance of the evidence that such failure, if any, was negligence as that term has been defined herein?

"Answer: 'Yes' or 'no'.

"If you have answered the preceding Special Issue No. 24 'yes', and only in that event, then answer:

"Special Issue No. 25

"Do you find from a preponderance of the evidence that such negligence, if any,

was a proximate cause of the accident in question?

"Answer: 'yes' or 'no'.

"Special Issue No. 26

"Do you find from a preponderance of the evidence that Lillie Mae Wilkerson fell while the train was in a stationary position?

"Answer: 'yes' or 'no'.

"No.

"Special Issue No. 27

"Do you find from a preponderance of the evidence that the occurrence made the basis of this suit was not the result of an unavoidable accident?

"If you find from a preponderance of the evidence that the occurrence was not the result of an unavoidable accident, you will answer 'It was not the result of an unavoidable accident'; otherwise, you will answer 'No'.

"Answer:

"By the term 'unavoidable accident' as used in the preceding Special Issue is meant an event which happens suddenly and unexpectedly and which is not proximately caused by any act of negligence on the part of Mrs. Lillie Mae Wilkerson or *Rebun* Wilkerson, plaintiffs herein, or on the part of the railway company, defendant herein.

"Answer: It was not the result of an unavoidable accident.

"Special Issue No. 28

"Do you find from a preponderance of the evidence that before the accident in question Mrs. Lillie Mae Wilkerson was suffering with her lower back and legs and other difficulties?

"Answer: 'yes' or 'no'.

"No.

"If you have answered the preceding Special Issue No. 28 'yes', and only in that event, then answer:

"Special Issue No. 29

"Do you find from a preponderance of the evidence that such damages as are now claimed by the plaintiffs were solely a result of such prior troubles, if any, that Mrs. Wilkerson suffered?

"Answer: 'yes' or 'no'.

"Special Issue No. 30

"Do you find from a preponderance of the evidence that Mrs. Lillie Mae Wilkerson sustained any bodily injuries as a direct result of the occurrence of May 13, 1950?

"Answer: 'yes' or 'no'.

"Yes.

"If you have answered the preceding Special Issue No. 30 'yes', and only in that event, then answer:

"Special Issue No. 31

"What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiffs, Mrs. Lillie Mae Wilkerson, and her husband, Reuben Wilkerson, for such injuries and damages as have directly resulted or will in reasonable probability directly result in the future by reason of such injuries, if any, as you find from a preponderance of the evidence were suffered by Mrs. *Willie* Mae Wilkerson as a direct result of the occurrence of May 13, 1950, made the basis of this suit, taking into account such of the following elements which you find are established by a preponderance of the evidence and none other:

"(a) Such physical pain, if any, as you may find from a preponderance of the evidence she has sustained from May 13, 1950, to the date of this trial, directly resulting from such injuries, if any, suffered on the occasion made the basis of this suit:

"(b) Such mental anguish, if any, as you may find from a preponderance of the evidence she has sustained from May 13, 1950, to the date of this trial directly re-

sulting from injuries, if any, suffered by her on the occasion made the basis of this suit;

"(c) Such physical pain, if any, as you may find from a preponderance of the evidence she will in reasonable probability sustain in the future beyond this date directly resulting from injuries, if any, suffered on the occasion made the basis of this suit;

"(d) Such mental anguish, if any, as you may find from a preponderance of the evidence she will in reasonable probability sustain in the future beyond this date directly resulting from injuries, if any, suffered on the occasion made the basis of this suit;

"(e) The reasonable cash value of such loss of services, if any, of Mrs. Lillie Mae Wilkerson, as you find from a preponderance of the evidence has been sustained since May 13, 1950, to the date of this trial, directly resulting from injuries, if any, suffered on the occasion made the basis of this suit;

"(f) The reasonable present cash value of such loss, if any, of the services of Mrs. Lillie Mae Wilkerson as you may find from a preponderance of the evidence will in reasonable probability be sustained in the future beyond this date directly resulting from injuries, if any, suffered on the occasion made the basis of this suit?

"Answer by stating the amount, if any, in dollars and cents.

"$50,000.00

"Fifty thousand dollars."

At the conclusion of the final argument in behalf of the appellees the appellant filed a motion for a mistrial based on the improprieties contained in such argument, which was by the court overruled.

On the jury's verdict the court entered judgment for the appellees against the appellant for the sum of $50,000.

Thereafter the appellant filed its amended motion for new trial complaining of all the matters which are brought forward on appeal by the appellant in its brief. The trial court heard the evidence on the motion and thereafter said motion was overruled and the appellant has duly perfected its appeal to this court.

■ The appellant's 15th point is "that the trial court erred in entering judgment for plaintiffs upon the jury's verdict and in overruling defendant's motion for new trial for the reasons that (a) there was insufficient evidence to support the affirmative answer of the jury to Special Issue No. 30, (b) the affirmative answer of the jury to Special Issue No. 30 was against the overwhelming preponderance of the evidence." Special Issue No. 30, as quoted above, inquired of the jury whether Mrs. Wilkerson sustained any bodily injuries as a direct result of the occurrence of May 13, 1950. In passing upon this point it is necessary that we summarize the evidence. Reuben Wilkerson testified that he and Mrs. Wilkerson had been married for 14 years and had three children, the youngest about 8 years old; that his wife had been in good health except that she had had two operations for female trouble, the first in 1943 and the other one or two years later; that after these operations she was able to resume all of her housework, washing and gardening, worked at the sawmill, helped him operate a cross-cut saw cutting ties. She had also had pneumonia, measles, malaria or fever, which was about a year before the accident. Other witnesses testified that she had done this hard work assisting her husband and that prior to the date of the train accident she was a strong healthy woman and that after the accident she had been in bed all the time and seemed like she was paralyzed.

Reuben Wilkerson also testified that on May 13, 1950 he and his wife went from Shepherd to Cleveland by bus in the morning. Cleveland was 12 miles from Shepherd. At Cleveland he went to the hospital to pay a bill for surgical work on one of his little girls and paid some insurance premiums and his wife went to the hospital to see a friend Mrs. Murphy who was in the hospital. About 10 o'clock in the morning they left Cleveland for Shepherd by train,

since the train left before the bus did. When the train reached Shepherd the station was announced and the train came to a stop. After the train came to a stop he and his wife were in the aisle, they made two or three steps and the train made a motion like a freight train jerking. No warning of any movement was given and no whistle was blown. The jerk threw Mrs. Wilkerson against the lefthand side of the restroom and on the floorway of the car. Mr. Wilkerson did not fall but he caught the side of the room to keep from falling. According to Mr. Wilkerson it looked to him like she struck her head and left side against the restroom. He got under her arm and picked her up and asked if she was hurt, she said she was and said "I can't get up—I am unable to get up." After they got off the train he had no conversation with the conductor except to tell him she was hurt. He testified that in the conductor's presence he asked his wife "Are you hurt bad" and she answered "I am hurt —my back is burning and stinging." He had no further conversation with the conductor. He carried her away from the station by holding her underneath the arm, supporting her to Beeson's Grocery Store in Shepherd, about 200 yards away. Over at Beeson's store he set her down on a grocery box and got a truck to carry her to the house, which was about a mile away on the Cold Springs road. When he got home he picked her up and toted her into the house. At the time they got there she was unable to walk herself, seemingly totally unable. She was complaining that she was stinging and burning in her back. From that day until the time of the trial she has never been able to be up except when he picked her up and put her in a wheel chair. He tried to get her to move and help herself but she could not move. He called Dr. Hale out to see her about 1 o'clock the same day. He examined her and gave her some medicine and talked to her about her troubles and she explained to him what happened. Dr. Hale has been seeing Mrs. Wilkerson off and on the following year and one-half. Mr. Wilkerson had also taken her to Dr. Lerner in Houston who examined her and gave her some medicine.

Dr. Lerner sent her to Dr. Brown, a brain specialist, and he examined her. Dr. Brown gave her all sorts of tests and things, scratched her and gouged her. She was unable to move at the time of the trial and had not been since they brought her home from the train. She does not sleep well at night, she has to have hot water bags and electric pads, her muscles have become flabby and soft, the flesh on her legs is soft and cold, looks dead and feels dead. She hardly ever opens her mouth unless she asks for something and she answers you the wrong way sometimes and the right way sometimes. On invitation of counsel for appellees the jurors walked over to Mrs. Wilkerson seated in a wheel chair in the courtroom and felt her feet to see that they were cold. The witness further testified that she has many weak spells and cannot even drink water without vomiting and is unable to care for her own body requirements and he has had to wait upon her as a nurse ever since she got hurt.

Dr. Hale, who has been the Wilkersons' family doctor, testified that he had examined Mrs. Wilkerson shortly after 1:15 P.M. on May 13, 1950. He saw her at their home which was about half a mile from Shepherd. At the time he examined her she was in bed complaining of pain in her back and she told him that she was unable to move her lower limbs. He tried to get her to move her limbs and she made no attempt to move them on her own accord. He manipulated her legs and she complained of pain when he did so. At various times when he saw the patient following the original examination she still complained of the same pains. In the doctor's opinion her condition has continued about the same, it has not gotten worse nor has it improved. The witness had noticed no apparent changes in her general appearance for the year and a half that he has been treating her. In the doctor's opinion at the time of the trial Mrs. Wilkerson was totally disabled for the performance of her work or duties and in his opinion she would never recover. He had used every known remedy to try to get her on her feet and walking again with no success. He testified that

he made a record of his first call upon Mrs. Wilkerson immediately following the examination when he reached his office. He testified that Mrs. Wilkerson told him that she stumbled and fell on the train; she hurt her back at that time; she got off the train about 10:30, walked around town about an hour. Among other places she went into Beeson's store for about an hour. Then she had a dizzy weak spell and they put her in a car and took her home and put her to bed. She did not tell him anything about the train having lurched with her and threw her to the floor nor about the train having given a sudden jerk and thrown her to the floor. She told the doctor that when she fell she hurt her back. Neither Mr. nor Mrs. Wilkerson told him that Mr. Wilkerson had to carry her or support her from the train over to Beeson's store. They gave him no history of having on the train sustained an injury or blow to her head and there was no mention of any injury to her head. After he took this history from them he made a careful physical examination of her. In the examination he did not find any bruises or scratches or abrasions or cuts upon her. Her pulse, temperature and blood pressure were normal. Her patella reflex was normal as were all the reflexes which he tested. He found no indication of any muscle spasm and found no evidence in the course of his examination of any injury to the physical structure of her body. He also testified that if Mrs. Wilkerson had sustained an injury of such a nature as to render her paralyzed and to cause her to spend over a year in a wheel chair or in bed he would expect to find her at the time of the examination on the day of the injury in a state of shock where the pulse was usually very rapid and very weak, blood pressure would be lowered below normal. There would have been some evidence of muscle spasm, and there would have been some reaction from testing the lady's reflexes; if she had sustained·an injury which would have brought about paralysis and inability to move over an extended period of time he would have expected she would have some complaint and evidence of injury to her head and he found no

such injury. Physically he could find no evidence of any injuries from the train. The only findings he had to go on that she was having any difficulty at that time were her own complaints of pain.

Dr. Brown examined Mrs. Wilkerson October 5, 1950 and testified that from his examination she was suffering from hysterical paralysis; that in his opinion she had bruised or sprained her spine or had perhaps had a concussion of the spinal cord but that she had recovered from that and that a nervous disorder from which she was suffering prolonged this paralysis until she is now suffering from a hysterical paralysis. In his opinion she was totally disabled at the time of the trial and that he did not believe that she would ever recover full use of her legs or would completely recover from her nervous condition; that she had suffered physical pain and will suffer mental pain and anguish as long as she lives.

Dr. Robertson testified that he examined Mrs. Wilkerson fully and found no evidence of injury to the physical or nervous structure of her body. He found her to be suffering from hysteria, which is disabling her.

All the members of the train crew and the station agent and the railway postoffice clerk testified that there was no unusual jerk or motion of the train or anything out of the ordinary at the stop at Shepherd on the day of the accident. Two other passengers of the train that day testified that there was nothing unusual about the stop at Shepherd. Nobody testified as to the jerking and lurching of the train at Shepherd except the two appellees, Mr. and Mrs. Wilkerson. One witness testified that he saw Mr. Wilkerson helping Mrs. Wilkerson away from the train, but did not see the train stop. The conductor testified that nobody made any complaint about being hurt on the train that day at Shepherd, no complaint of an injury was made to the railroad at all until suit was filed some 30 days after the accident. We believe this evidence is insufficient to support the jury's finding that Mrs. Wilkerson received

any bodily injuries as a direct result of the occurrence of May 13, 1950. The evidence is sufficient to show that Mrs. Wilkerson's physical condition is deplorable, that she has suffered and will continue to suffer great pain and probably will not recover from her condition. From the evidence Mrs. Wilkerson was about 30 years of age at the time of the trial and had been married 14 years, living a life of great hardship and toil. She had had various ailments before the time of her trip from Cleveland to Shepherd on the train and it is from this undisputed evidence that it must be concluded that she was not a well normal person at that time. From the testimony of Dr. Hale who examined her within a few hours after her fall it is extremely doubtful that she received a disabling trauma, which caused the serious physical condition in which she was at the time of trial and had been enduring for more than a year prior thereto. With the testimony of both Mr. and Mrs. Wilkerson and the testimony of Dr. Hale in mind we cannot escape the conclusion that the evidence was insufficient to support a finding that she received any traumatic injury or that her physical condition was caused by a fall. The evidence above summarized is not sufficient to show that she received some trauma or blow which caused some physical bruise or sprain of her spinal cord or nerves, which all the doctors testified would ordinarily be found to be the cause of the nervous disorder from which she is now suffering. This is true even if it be assumed to be true that the train lurched and jerked and caused her to fall, which is somewhat doubtful itself. The relation between the fall and her present condition is so vague from the evidence that the jury's finding on the issue must appear to rest upon speculation and conjecture. The evidence in this regard is insufficient to support the finding of the jury and it is also against the overwhelming preponderance of the evidence. It is contrary to the evidence of Dr. Hale, the physician of appellees, who was called as a witness by appellees. Appellant's 15th point is sustained.

The appellant presents the above 15th point in its brief jointly with its 16th and 17th points. By these latter two it contends that there is no evidence to support the jury's finding of $50,000 in answer to Special Issue No. 31, and that the evidence in support thereof was insufficient and against the overwhelming preponderance of the evidence and that an award in that amount was grossly excessive and should be set aside. It is true that these three points are closely inter-related but we do not feel called upon to discuss Points Nos. 16 and 17 at length in view of our disposition of Point No. 15. We will discuss the matter of the size of $50,000 verdict and finding by the jury below in this opinion in consideration of the appellant's Point No. 14, which deals with the complaint that counsel for appellees indulged in improper argument to the jury. The points themselves, 16 and 17, must be overruled, but we will consider the effect of the matters complained of here in the discussion of the holding under Point No. 14.

The appellant's Point 14 complains of improper argument of counsel. We have read the entire record in this case consisting of nearly 1200 pages in the Statement of Facts as well as the extensive transcript and the briefs. The Statement of Facts, of course, includes the argument made by counsel. We note there was considerable bickering and squabbling and side bar remarks by counsel throughout the trial and this extends from the preliminary examination of the witnesses on the question of change of venue through the individual examination of prospective jurors on their voir dire, the examination and cross examination of witnesses on the trial and the argument to the jury, especially in appellees' counsel's final argument, and the examination of witnesses on the motion for new trial. We think the argument complained of can be properly evaluated only when it is borne in mind that a verdict for a large amount was returned after only a short deliberation by the jury in favor of a woman in dire physical and financial circumstances, a resident

of the community where the case was tried and where the jurors lived, on evidence which we believe was insufficient to support the finding that the appellant railroad company caused the injuries to this unfortunate woman. It is only with these elements in mind that such argument can be properly evaluated as improper, vicious and calculated to inflame the jurors' sympathy for the woman and arouse indignation and resentment against the railroad company and its attorneys in the trial of the case. It injected into the case matters which are not in evidence. For these reasons we print in full the closing argument of counsel for appellees, which was as follows:

"Mr. Helm: May it please your Honor, gentlemen of the jury, are you as impressed as I was with the young—I want to emphasize that because he wants to get it over to this jury that he is about the youngest lawyer that ever came into a court house. Actually, he is an older man, a man with a great deal more experience, than Alvis Ellisor. But did you hear Alvis Ellisor get up here and whine, and fumble around, and beg this jury to save him—to save his railroad from a $100,000.00 verdict because he was young? Baby Bill. Baby Bill. Now, you know, that is systematic of everything that has been done in the defense of this lawsuit. I was always told that a half truth is no truth and worse than a lie. Some of you men—I can see some of you smiling—some of you were taught the same thing on your father's knee or your mother's knees, those of you that were lucky enough to have a mother that was healthy in mind and body. You know what I am talking about. And I was taught that a half truth was more despicable than a lie. And why is that so? Because it intentionally and purposely tries to mislead innocent people in this case, twelve men trying to do their dead level best to pass on the rights of injured parties.

"Rubin, bring Lillie Mae around, will you?

"I want you men to take a long last look at this little woman. Bill Browder kind of tickled me. He says, I am not going to call her a woman. He said, I am going to call her a lady. She is not trying to be a lady, Bill. She has no pretense of fine clothes, and fine manners, and that sort of thing. She doesn't resent your calling her a woman. I appreciate your feeling about it. I think you meant it in a nice way. I really do. But she is not making any pretense of her bed of pain, of her bed of misery. She doesn't want that kind of praise. She is that little woman, and you can stand over here by her, Rubin. You have been standing by her side for a good many years before you heard of this, before you heard of this railroad, and before you heard of this lawsuit, before you heard of these doctors, before you heard of these lawyers, and whatever this jury does, you are going to be standing by her as long as she draws a breath of life and as long as the Lord will let you be here to take care of her. And those are the two frauds and the frauds' lawyers. You are looking at one of them.

"Judge Lilley, stand up, please, sir.

"Where is the Judge?

"Mr. Ellisor: He stepped out a minute.

"Mr. Helm: I guess he has gone to get himself a can of beer. And I don't blame you, Judge, but if you were here, I would say the same thing that I am going to say when you are out of here. I don't believe that a man that had lived in San Jacinto County and entrusted his affairs, the most valuable rights a man has got, his property rights, or his estate, or whatever it might be, that thought enough of Judge Harve Lilley to entrust his family affairs, even his life to that gentleman that this young whippersnapper, Baby Bill, would have the audacity to come to a county like San Jacinto County with some honest-to-goodness, real he-men on the jury and tell them that Judge Lilley was a fraud, and representing a pair of frauds, and he has some fraudulent associates with him. I am glad that you are in San Jacinto County where people judge people as they really are.

"Yes, I am sitting up in a fine office in the Sterling Building in Houston, and I

didn't get it as a result of any help out of you or any of your associates, and I haven't got two floors of an office building like you have. I am in the Sterling Building. If anybody has ever been down there, it doesn't compare with your fine offices in the Mellie Esperson Building and the Niels Esperson Building. And that is another half truth that you didn't think I was going to call you on, Son. Baby Bill. Wanting to cry up to this jury 'Innocent' and get you off and back off because you haven't got any defense in the case except a bunch of railroad employees that your company has already intimidated by a system, an archaic system, of demerits or brownies that they get and they are penalized with when they report one another's misconduct on the railroad. And then to get up here and say, oh, we brought these witnesses, witness after witness against you, Rubin. And, Son, you are not going to win this lawsuit if you have to produce witness against witness if you cannot win it on quality, and the quality, and the integrity, and the honesty of your testimony, Son, you are not going to win it on quantity, and I hope I never have to be forced to try a lawsuit where I have to outbid the other side for witnesses.

"And who did they bring? An engineer who had been pulling an engine and train for forty-seven years and, in the forty-seven years, had never made a bad or rough stop with a passenger train, and, furthermore, he had never failed to blow the whistle at a crossing. He had been on the witness stand before. He had experience. He knew what was expected of him. Brother, they are so busy blowing that whistle on the witness stand. If they had blown that whistle and rung that bell as much as they go down that track as they do on the witness stand in the court house, we wouldn't have any accidents. But that other fellow that had been on there, that fireman that had been on there twenty or thirty years, he had never heard of a rough stop on a passenger train. They are the finest bunch of trainmen in the world. They never have heard an engine fail to blow for a crossing or fail to ring a bell. I know that is hard for some of you men

to take, and I know you felt it was just as silly and as untrue as I did. But Baby Bill wants to be called so young, and wants the jury to decide the case for his client because he is young.

"Alvis, if you ever get up in a courtroom and cry around before a jury to win the case because you are young, I just hope, as close a friend as I am to you—I think I would just kick your rear end and kind of get you straightened out. But, thank goodness, you are not a smart-alec, and I am glad. I don't know whether men our age, fellows as old as we are, like that kind of business or not, and I guess it is smart sitting around the office, telling about what I did to that witness, and those lawyers in the courtroom in the court house, and how I fooled that jury, telling them how young and inexperienced I am. I don't think it goes with a bunch of real men in the jury-box; not in San Jacinto County, anyway.

"You don't like Dr. Brown, do you, Bill, Baby Bill. No, you don't like him because he is fearless. He is fearless and he is not going to be intimidated by a bunch of railroad lawyers. Mr. Harvin up here, I guess I ought to get more respect of him because he certainly has a power of confidence in himself and his own ability. Did you ever see anybody bustle up and swell up with confidence and conceit as he did in what he told you about Dr. Brown? They don't raise them all down there that way. I was born and raised in Harris County, and I will tell you right now they don't raise them all like that down there. But he despises Dr. Brown because Dr. Brown is not going to be intimidated by one railroad lawyer like Bill Harvin or a thousand of them like him.

"All right. Who have they had to defend this lawsuit? They started out with the law firm of Woodul, Arterbury & Folk. They took all these depositions sitting up there. They saw what this lawsuit was about. Yes, just like that old, colored porter they had on there, that preacher. Yes, they read the depositions. Sitting around there, yes, sir, Judge Arterbury—we all sat around and talked to him. They were al-

ready pretty perfect, some of those railroad witnesses that had testified before and for the railroad, but, Brother, when they finally got polished up for the depositions, they were super-perfect, and when they got up here to the court house, they didn't miss a bead on a whistle, or a stop, or a bell, or anything else. Those lawyers, those deposition-takers, they got the witnesses ready, Woodul, Arterbury & Fold. Now, then, they kind of disappear out of the picture, and I don't blame them. Roy Arterbury knew the kind of defense they had, evidently. I don't know.

"Then they get these other lawyers. They get this Bill Harvin and Tom Phillips with Baker, Botts, Andrews & Parish, Mellie Esperson Building, Niels Esperson Building. Then who do they get? They get Wilbar Browder, Niels Esperson Building, Mellie Esperson Building, stretching across two more floors, with the firm of Vinson, Elkins & Weems. Then they get my old friend, Ross Hightower. They run clear up to Livingston. They get Ross. And I could see. I kind of felt sorry for Ross. He makes one of the best darn speeches, and he and I have had a couple up there together in Polk County. I like to have him on my side, too. I could see that Ross—how he was on the line. They evidently told him what they wanted him to say. He got up and you couldn't hardly hear him talk because he was whispering. He was a little ashamed of having to say some of the things he was saying. But he is still on the party line, so to speak, and says they are frauds. Not Mrs. Wilkerson, but Rubin is a fraud because, Rubin, when you married this girl, when you raised your hand and said I will take her for better or for worse, in sickness or in health, that you misled her, and you are a little, old fraud because you didn't tell her when you married her she was going to have to get out there and use a crosscut saw, and use an axe, and peel some poles. And you are actually the worst fraud and the lowest fraud of all because you started out fourteen or fifteen years ago to be a fraud. But he said that so low, I am not sure that all of you jurors even heard what

he was saying. Judge Lilley heard it. Judge is kind of on his toes. Judge made a pretty darn good speech. If he left anything unsaid—and I wish he was making this closing speech to take care of Baby Bill. All right. So Ross says, that is the most terrible thing I ever heard of. Well, Judge Lilley pinned him down. You have seen these wrestling matches; pulling loose of each other, and they finally get them and pin them down to the floor, and the referee counts the time of it and all that business. Well, Judge Lilley in his nice, quiet, gentlemanly way—the Judge is a lawyer of the old school. There are not many of them left unfortunately. There are not many of them left. He is a lawyer of the old school. He said, gentlemen, you know why Rubin had that girl, that woman, his wife pulling that crosscut saw, and he looked out there and pointed to those little fellows. And they condemn and we finally see the line of attack they are taking. Fraud when he married the woman, that is what their doctors say.

"Here is what the doctor says, and this is in here. It is in evidence. 'The patient is a well developed and nourished white female'—healthiest looking thing you ever saw in your life. That is what he said. He has got it written down here. He signed his name to it. 'White female brought into the office on ambulance litter; she appears tense; apprehensive; all replies to questions are vague; she is somewhat suggestive,' I think. 'She and her husband together are informants for the history detailed above.'

"Here is what they think about that little couple. Here is what the doctor thinks about it. Rubin didn't have to take his wife to that doctor. Under the law of Texas, a man doesn't have to take his wife in a common law action. This is not a compensation case. This is a common law action. He didn't have to submit his wife to the hostile eyes and hostile hands of another doctor. He took his wife over there voluntarily. Why? Because he had nothing on God's green earth to hide. And what does the doctor say about them? Here it is at the bottom of the page: 'Both are

rather ignorant and uneducated.' 'Both are rather ignorant and uneducated.' I am just going to underline 'Both are ignorant and uneducated.' And if you don't believe that is in there, I wish you would look at it there where I have underlined it and pass it down the line.

"That is what we are fighting. That is what we are fighting. And Bill Harvin had the temerity to get up here and tell you that this is the tenth anniversary of Pearl Harbor. He had the audacity to tell this jury that that was the day that we were forced to fight for our freedom. And, Bill, you and I must look at freedom through different kinds of eyes and through different views. Freedom to have your lawyers if you had the misfortune to receive a tragic accident on the train on a day where everybody there and every witness produced in court was either on the pay roll of the railroad, the defendant in this case, or either on the pay roll or riding its passes. And out of a clear, blue sky they produce this first lady, nice looking lady, well dressed, and all that business. I have forgotten what her name was, but it doesn't amount to a hill of beans what it is. And she gets on that stand out of a clear, blue sky when they didn't know a thing in the world about how this accident happened, mind you, men. And it is those little things, those telltale bits of evidence that focus the truth on the real point in dispute. And she gets up and takes the stand and, low and behold, she was on the train, and they passed her off, and it never occurred to me that they would have the audacity and the brass—You used that word, Son, brass—the brass to bring a witness up unexplained. And I figured, well, there is nothing to do but find out how come. It was obvious there was a nigger under the woodpile somewhere. Never seen the woman before, but I am kind of onto this stuff. Thank goodness, I have had the honor of representing some injured people in the past, and I was prepared for this kind of stuff. And out of a clear, blue sky, I said, 'What does your husband do?' Oh, she was a widow. I am sympathetic with widows, don't misunderstand me, but that is some of that widow stuff to it. All right, she is a widow. 'What did your husband do, good lady?' And low and behold, he was a railroad employee, and he was dead. Well, they figured that won't give them any key, what is going on. And I said, 'By the way, are you riding on a pass?' And not a single one of you twelve men occupying those chairs here, going to pass on this necessarily life and death matter, would have known about it if I had not taken tab in here and found out she was a pass rider.

"And then they brought up another, and by that time I had a key to the witness sure enough, but we found the same old pattern, the same old scheme, just to put it a little more bluntly, another pass rider. Another pass rider. That is all, lady. I thought so. I just wanted the jury to see it. They thought so, too. We just wanted it in the record, so there wouldn't be any dispute about it.

"And then they criticise me for not bringing in, subpoenaing a witness, a railroad man, that is employed by the railroad, in all probability to prejudice his job. I have never called a witness or subpoenaed a witness to the court house in my entire practice if I thought it would interfere with his livelihood one second. Who then was I to get? A company man? What luck do you think I would have? The fellow might have told me what the facts were privately. He would have said, don't ask me to tell you what I know, Shirley, I have a family. You know that as well as I do. What do I do? I needed a man who doesn't have any strings on him, who was not afraid for one minute to raise his hand and take that oath, and to come in here. No, he didn't have a cap with 'Railroad Engineer' on him like Dr. Robert C. L. Robertson who had that badge of some academy, and said the only people in the world that know anything about neurology and brain surgery are those that belong to that same branch or that same society that he, Robert C. L. Robertson, belongs to. No, Son, he didn't have 'Railroad Engineer' written on his cap, but he had something a lot better than that on there. He had the experience of pulling those trains and stop-

ping them, and he was not afraid to get up and he practically laughed in the face of anybody who contended that they operated trains without a jerk, passenger trains or any other kind without a jerk, for year in and year out, or that they had obeyed all the rules, and all that business. And, you know, they didn't like it because that man was an expert. The only thing they found wrong against him, they jumped on him and said, 'Did Shirley Helm try a lawsuit for you?' They didn't want to hear anything about it. They didn't want to hear anything about it. See what I mean? See what you are up against? See the kind of opposition you have? A half truth is a lot worse than no truth. It goes all through their defense, interwoven into all their actions, activities, speech, and everything about it. All right. Ray Sharp said that was not the proper way, the safe way and the way to stop a train, and he told you what. And we found out, of course, that the train was running late. We found that out. Those little things, those telltale bits of uncontradicted evidence that put the jury on the track to the right answers to these questions. But they didn't like Ray Sharp. Why? Because Ray was no longer connected with the railroad. His meal ticket was ended because he was crippled on the railroad. His livelihood was gone, and he had no more strings on him to tell him how to testify so that he wouldn't get any brownies or any demerits.

"And I asked that engineer, I said, in that forty-seven years, I said, you all report them and all that when they violate the rules? Then I came down and found out not a single one reported a single one right up until May 13th, 1950, when that conductor standing out there—and he was honest enough to say, when he was on the ground, that that train might have jerked. And that is the lawsuit. And do you think that when he put out a couple of ignorant and uneducated hillbillies from the piney woods of San Jacinto County, and put them off at that Capital City of Shepherd, Texas, that he would ever think he would hear from them again even though they had to hobble off and carry off a crippled woman?

No. He said—I can hear him now. I can read his thoughts—those two rather uneducated and ignorant, piney woods hillbillies don't have sense enough to do anything about it, and I ain't going to get any brownies or demerits for the fellow up there in front because I might get some for me. I might be next, you know. All right. That is the start of the whole thing. But it is evident to me, from who they brought up here, that he went through that coach and he picked out some future witnesses if he needed them to swear that nothing happened. And who did they get? He got two pass riders. And they were going to pass them off on you as honest-to-goodness, disinterested witnesses to condemn these two little, poor, old, pitifully looking frauds.

"But things don't work that way on the tenth anniversary of Pearl Harbor in San Jacinto County, In the County Seat of Cold Springs or over at the Capital City of Shepherd, Texas. There may be some hillbillies in this county, and there may be some ignorant, uneducated people in this county—Dr. Robert C. L. Robertson of the Academy of Medicine and the Neurological Society of so-and-so and who done it to who. But those uneducated people happened to have a lot more common horse sense than some of you bookkeepers that had the audacity to take the stand and swear your head off, and then take the position in front of this jury, try to impress the jury with your great learning in spite of your tender youth.

"And you don't like Dr. James Albert Brown because he is not going to be intimidated by you or anyone else sitting around the counsel table, trying to cast any kind of little, nasty intimation you can on him. If there were a few more people that would protect their homes, themselves, instead of calling on others to protect them all the time, we wouldn't have as many things going on as we do. And James Albert Brown, that they despise because he testifies for injured people, told you men that the woman was totally and permanently disabled for life, in his opinion, the same thing that Dr. Hale told you. And you

again hear from the other side, in the defense, in the interpretation of those two men's testimony, Dr. Hale and Dr. Brown. They again apply that test. They instill in the defense of the lawsuit that old standard of half truth, if you get by with it before a jury. And you heard him say, gentlemen, you just got to remember what I said because Shirley Helm is going to have the last word in this lawsuit. And, thank goodness, I do have the last word because I may be the means of throwing a little light on some situations that they have tried to clutter up by half truths. And they try to tell you that you ought to answer this question, was there any bodily injuries, 'No,' there were no bodily injuries. Why? Because there were no broken bones. Why didn't we show you the X-rays? Because we told you the X-rays didn't reflect any broken bones, and one of the doctors that testified and took the stand said the main purpose of X-rays was to show fractures and broken bones. This woman is not claiming any broken bones. I wish it were that easy. I wish to goodness it was that easy. Broken bones can be mended. Broken minds, nervous systems, and those things sometimes can be mended; more often, not. And we are dealing with an intangible thing. And they want to again mislead you astray and say, because she didn't have any broken bones, there are no bodily injuries. And I took the watch and demonstrated it and showed you you could drop a watch on the floor and not break the crystal, not break the case, and not break any hands off, and hold it up and it looks perfect, hold it up and it won't tick. That is the same thing that happened to this good woman. And why do I say 'good'? Because I mean good.

"And they told you they cannot believe Dr. Brown because he was bold enough to say that all of us have uncontrollable instincts. It was that way when man was first put on earth. He had to protect himself regardless of death or anything else. And they have the audacity and get up there as if no man on this jury had been outside of San Jacinto County or heard anything except what they want to put down their throat. And they had the audacity and temerity to tell you men that Dr. Brown wasn't telling you the truth because as a psychiatrist he says that children do have uncontrollable instincts and desires from the earliest time man was first put on this earth up until now, and everybody that knows anything knows that that is true and that selfpreservation is the first law of nature. Selfpreservation was instilled in us when we were first put here, if it took murder or anything else to preserve ourselves, and that is what he meant.

"But, by the way, boys, even Wilbar—I was kind of surprised by Wilbar, but I guess you have been coached on the stand you should take on this, too. So he went along with them to build up with the masterful closing argument you just heard, and said, oh, condemn him because he was asked about the natural instincts of a person and told you. He told you that people finally curb those instincts. Did you ever see a child with a hightemper get mad? He would kill his mother, and daddy, and everybody else around him. Did you ever see a child take a baseball bat or something else and go after another one? Dr. Brown had the audacity to tell you what medically is true. But they didn't like it. Why? Because he says things exactly as he sees them. He just tells it the way it is.

"Then they say—oh, but there is the crowning glory They get this card. I was about to overlook that. They get the card with Dr. Hale's notes on it. They try to line Dr. Hale up as a party to this silly defense that they have finally thought of after two weeks of trial here. They finally say, well, Dr. Hale said she tripped. And I got Dr. Hale and I said, 'Dr. Hale, did you investigate this lawsuit?' And he smiled a little bit and he said, 'Certainly not'. And I said, 'Did you call there as a doctor to this good woman, and that alone?' And he said, 'Yes.'

"No, sir, he didn't take a statement. He was not interested in the lawsuit, or how this accident happened, or anything about it. The woman tripped after the train

lurched and she was thrown into that rest room and onto that floor. But, again, applying their standard in the defense of this case—you have seen it time after time after time, witness after witness after witness— again trying to get by with a half truth, a half truth. But Dr. Hale squelched their little hopes and their little inflated ideas about things, and he says, no, I am not trying to tell you anything about how this accident happened. Dr. Hale paid so little attention because he is a medical man and not an investigator like Dr. Robert C. L. Robertson who investigated for four pages of single spaced typewritten business; for four pages. Investigator Robertson. Now, Dr. Hale, he was there to try to give what relief he could to this injured woman. She called me, not for the purpose of a lawsuit, because she was injured. He told you he didn't even get the time that she stayed there at Beeson's store, and he was that disinterested in the accident. But they want to align him with their misstatements and misinterpretations, but he would have no part of it. He would have none of it.

"When he came here before this jury, were we claiming a single fractured bone? No, sir. Dr. Hale testified there were none. Dr. Brown testified there were none. They said she has got a hysterical paralysis. And if you want to know what Dr. Hale thought about her injuries, Son, Dr. Hale, in reply to a question I asked him, I said, 'Dr. Hale, is this hysterical paralysis that you say will disable this woman for the rest of her life and totally disable her, is it a real thing or not?'

"He said, 'It is a real thing.'

"I said, 'Dr. Hale, is it as real as if her arm was chopped off at the elbow?'

"He said, 'It is just as real.'

"How did Dr. Hale feel about this case? Do you think Dr. Hale would have ever come over here and testified for this woman and Rubin if he had not felt everything that she had told him was true? You man know Dr. Hale. You know him.

"All right. Then they say Dr. Brown goes to other counties and testified. Suppose a man in San Jacinto County, he lives in San Jacinto County where he has a right to have his case tried, suppose he gets a brain injury. Would he go to Dr. Robert C. L. Robertson who has testified here for the railroad? Would he go to him? He would probably be in no condition to select a brain specialist, but if he hired a lawyer worth his salt, if he hired a lawyer worthy to be called a lawyer and have a license to practice law, and that lawyer sent him, or Dr. Hale sent him, or Dr. Lerner sent him, and they sent him to a man like Dr. Robert C. L. Robertson that would testify to the things that he has testified to when you know what he thinks of people, they are rather ignorant and uneducated,—they are whipped before they ever get into Dr. Robertson's office. Would you condemn Dr. Brown because he is an honest-to-goodness, real man, a red-blooded American that would come up to San Jacinto County and testify for a citizen of San Jacinto County, tell it exactly the way it happened without pulling any punches to help the railroad company or anybody else? I leave that up to you, men.

"And now, then, they want to tell you how to answer these issues. Alvis Ellisor has covered them completely, and I am going to say, based upon the entire credible, believable, evidence, evidence that you can swallow, that you don't kind of choke on and have to spit up when you are listening to it, the evidence you can follow and believe, Special Issue No. 1 through 7 should be answered 'Yes'. Special Issues 8 through 26 should be answered 'No.' And you don't have to answer all of those because you are going to find, I believe, that she did what was right in getting out of the train, and old Rubin did what was right in getting out of it. And when you say, 'No,' they didn't do wrong, or whatever they ask about it, then you don't answer the next one or two following it.

"When you get down to Special Issue 26, that is still 'No,' was the train standing still when she fell or was thrown. Certainly, it was not standing still. It was lurching.

"Then you get to Special Issue No. 27. Let me show you another half truth and

another inconsistency, and I am about through. They tell you, Wilbar gets up here and tells you—Now, Special Issue No. 27, that is about the unavoidable accident—he says this motion was just unavoidable; nobody could help it. Bill Harvin tells you the same thing, it was unavoidable; nobody could help it; after they have already told you that Mrs. Wilkerson was doing this wrong, and that wrong, and everything else. Well, I want to know if they are going to blow hot and cold like two sides of a sapling; take one position one second, and another position another second. If you get down and look at the issues when you get them, they are asking you to do one thing, find that Mrs. Wilkerson was doing something wrong, and then they say in Special Issue No. 27, it was an unavoidable accident, and nobody could help it. That is just another method they are using, and I am going to say to you, don't try to swallow any of that stuff because you are going to choke on it as it goes down. You are going to have a bad, sick, stomach.

"The answer, based on the evidence, the honest and decent answer, is the long answer. You have to write the whole thing out on the bottom of the page, 'It was not the result of an unavoidable accident;' 'It was not the result of an unavoidable accident.'

"1 through 7, based on the evidence, 'Yes'. 8 through 26, 'No.' No. 27, 'It was not the result of an unavoidable accident.'

"No. 28, was all of this trouble she is suffering now—did she get it back there—did Mrs. Cruse put the high sign on her there, and when she was over at Mrs. Cruse's place, have all this trouble? The answer is 'No,' and you are not going to have to answer the next one, and then you get down to No. 30.

"And No. 30 asks you, did she receive bodily injuries as a result of this accident out there on that train on the 13th day of May, 1950, and your answer to that is, if you believe Mr. and Mrs. Wilkerson and Mr. Parker, as fine a man as I ever saw take the witness stand—Oh, Wilbar knew what Mr. Parker's word meant in a law-

suit, and he spent fifteen minutes talking about what a man Mr. Parker was. And I agree with Wilbar. He certainly is, and this jury knows him, too. They know all about him. And the answer to that is 'Yes,' she was hurt in this accident and got bodily injuries. And are they taking the position that someone has to have a broken bone to have bodily injuries? What could be worse than a broken mind, a broken nervous system. Hysterical paralysis, not bodily injury. That is the way they want to defend the case. I think the jury will take care of it. If you are going to believe Mr. Parker, if you are going to believe that Baptist minister, red-haired, sandy fellow, looked to be thirty-five years old, as fine a man as I ever saw, and made as fine an impression as any man I ever saw on the witness stand —do you think that charging that Baptist minister, along with the lawyers, along with the doctors, along with Mr. Parker to be in league with trying to perpetrate a fraud on this Court and jury,—that is a kind of poor defense, is it not, men? Wouldn't you kind of be ashamed to do that, yourself, if you were a lawyer for the railroad company? And that is what they ask you to believe.

"I am not saying anything about those other two ministers. They looked like mighty good men to me. They looked like mighty good men, and they were courageous enough to come up here and tell you men the same thing that the Baptist preacher did, the same thing that Mr. Parker did. And they were proud that a woman, if it is necessary in the piney woods on some of that poor land, probably, that they were living on, that the woman to help support that family, if it was necessary, would pull a crosscut saw, would peel poles, and would use an axe to chop wood, and would work in the mill over there across from her home to help her husband out, on the same pay roll with him, and they were proud of it because that is a Christian way of life.

"Yes, sir, I guess Ross and Wilbar really secretly down deep in their hearts admire that woman doing that rather than sitting around some honky-tonk drinking beer.

Which is the best, men? I am going to leave that up to you.

"Do you think those men of God, those reverend ministers of God, three of them, would take this stand and testify for a man who was trying to claim some things that didn't actually happen and weren't wrong? And Wilbar says, it is surprising to me she didn't get out and her husband didn't get out and tell the conductor, don't you know you threw me down on that train? Yes, gentlemen, it was so self-evident to Rubin and his wife what had happened, that the train lurched and she was thrown down, why should they tell the conductor who was standing right there and must have seen it and known what had happened? It was so self-evident that they thought it was unnecessary. And that is the best proof in the world, those silent witnesses, their failure—did you get out and shake your finger in the man's face? They knew it was not the conductor's fault. It was the fault up in front of that train. Obviously, you would never have heard of this case or Rubin Wilkerson except he lived in your community if, at the end of thirty days, she had recovered from this cruel and inhuman illness that she is suffering with and stricken with. Do you think that you would have heard of this man again? Why, certaintly not.

"And I asked her—And another thing in the evidence. Did they ask Lillie Mae Wilkerson one question on cross-examination, one single question? No, sir. They didn't because they knew that the truth was coming out of a mind that is now affected, and a mind that had no control over its thoughts. The only thing that she could tell were those things that happened to her out there on that cruel day of her fate that has stricken her and laying her low for life, and they knew that any insinuating question on cross-examination that they would ask her would merely strengthen the jury's confidence in the basic thing of what happened out there. And I saw that, and they saw the problem I was faced with when I went beyond a few questions that were so indelibly written on her mind, the day of her fate. She couldn't answer. She didn't even know what had taken place in the courtroom, the witnesses preceding her on the stand. When I asked her what the witnesses swore to, and all that, she said, 'What,' 'Huh,' 'Huh,' 'Huh.'

"And that is what that boy has to stand by. And I want you to take one last look before you go into that jury-room because it is going to be your last opportunity. You are going away from here. You are going to forget her. You are going to forget her when you get out of this court-room and try to shake all the things off. I couldn't carry them around every time I helped injured people. If I kept every one of these on my mind, I would be in a worse fix then she is.

"Death is sometimes more fortunate. As Dr. Robertson says, in a case of this character, death won't come immediately. She is in a state of mind that Dr. Robertson says is a very pleasant, happy state. If a person is going to look at them happily and think, yes, she is better off not knowing everything about her condition and everything that is happening, yes, but in those lucid moments that she has, don't you know her heart is being torn out that she cannot take care of those little girls, cannot go to church and Sunday School with them?

"If $100,000.00 is one penny too much for this jury to award that woman in her condition, I would like for any man to come out and tell Mrs. Wilkerson when he comes out of the jury-box, 'Mrs. Wilkerson, I feel sorry for you and I feel sorry for Rubin, but we had to compromise down your verdict because the railroad lawyers ran you down, and ran your lawyers down, and ran your doctors down, and everybody connected with you.'

"But I think that one and all—See, the railroad company, they knew at the start of this case that they would incense the minds of the men on the jury by the attack they made on this good woman, a church woman, a woman who had three ministers of the gospel and Mr. Parker to come up here on her behalf and raise their hands to God —I think one of the ministers did affirm

rather than raise his hand, and it is the same thing in his religion—and testified that she in this year and a half to their knowledge never had left this sick bed, never had been seen out any place, and never done anything except be lifted and turned over in bed.

"You men are not going to be intimidated. If they can get one man just to say—just to criticize a witness in the case, our witnesses, criticize our doctors, criticize our lawyers, if they can just get one man to compromise one issue down, answer the questions the way they tell you to answer rather than the way Al Ellisor told you to answer them, they have accomplished their purpose. One man. But, thank goodness, the twelve men sitting on this jury were picked with the knowledge of their feelings because everybody in this county is honest, and we couldn't get twelve finer men to put in a jury-box than the twelve men that are sitting here. And I predict that you men will be out of that jury-room—It is now five minutes past 7:00. You have heard the issues read. You know what this case is about. You heard Judge Coker read those definitions to you. And you are going to come out of that jury-room by nine o'clock with those questions answered according to the evidence as Mr. Ellisor explained it to you, and have an uncompromised verdict of $100,000.00, and I believe not one penny less, gentlemen. And I do thank you."

At the conclusion of the closing argument appellant's counsel moved for a mistrial on the ground that the argument was improper and was incurable for the reasons that it engaged in a series of personal epithets directed at appellant and its lawyers; that it stated that the law firm of Woodul, Arterbury & Folk had once been in the lawsuit for the railroad company but had disappeared from it because of the nature of the defense; that another one of defendant's counsel was ashamed of the case; that it stated that the railroad company hoped only to get the jury to answer one issue in its favor so that a compromise verdict might be entered and told the jury of its effect on their answers; that counsel in its argument stated that he could not get another railroad man to testify as an expert witness because such railroad men would lose their positions if they testified as to the truth; that the argument stated matters that are not in evidence; that there was some type of conspiracy between the railroad company and others to prevent a lawyer from subpoenaing such witnesses and getting the truth, when there was no evidence in the record to that effect. No objection was made to any part of the argument while it was being made. At the conclusion of the argument the jury was excluded from the courtroom and a motion for mistrial was presented to the court. The motion was made to the court before the case was submitted to the jury for their deliberation. Counsel for the appellees invited the appellant's counsel to point out any matters in the argument that they wanted the jury instructed about and stated that they had no objection to what "they ask the court to instruct the jury at this time." Counsel for appellant replied that the argument was so prejudicial that no instruction could remove the prejudice thereby created.

From the discussions on the question of improper argument of counsel contained in the cases of Southwestern Greyhound Lines, Inc., v. Dickson, 149 Tex. 599, 236 S.W.2d 115, by the Supreme Court, and Wade v. Texas Employers Insurance Ass'n, 244 S.W.2d 197, 201, also by the Supreme Court, we are convinced that no hard and fast rule has been or can be announced by which it can always be safely said that one type of argument in all cases is prejudicial and harmful and incurable, and that another type of argument in all cases under all circumstances is of the curable type and is waived by opposing counsel when there is no objection made thereto. As stated by Justice Garwood in Wade v. Texas Employers Insurance Ass'n, supra, "we judge by the degree of the vice, not merely the subject matter of the argument." With the reasoning of these two cases in mind, we hold that the above argument of counsel in this case contained matters which were improper and prejudicial, both of the cur-

able and incurable type. The statement that Mr. Arterbury, formerly counsel in the case for the railroad had withdrawn from the case because he knew what the defense was was outside the record entirely. The statement regarding what a prospective expert witness would have told counsel if he had called him as a witness for the appellees is not in evidence and intimated that the railroad company had a system of demerits by which witnesses were intimidated from testifying. The epithets and the continued use of words to belittle and criticize the appellant and its counsel are inexcusable. The argument as a whole seems to us to fit the description given in Southwestern Greyhound Lines, Inc., v. Dickson, supra [149 Tex. 599, 236 S.W.2d 120], to the argument of counsel in that case, "exaggerated and inflammatory remarks of counsel" and "both unfair and much more likely to arouse passion and prejudice than to convince the minds of the jury." We are satisfied from the record as a whole that no instruction by the court could have cured the argument and that the impropriety of the argument probably influenced the verdict unfavorably to the appellant. See: Texas Power & Light Co. v. Hering, 148 Tex. 350, 224 S.W.2d 191 and Southwestern Greyhound Lines, Inc., v. Dickson, supra.

■■ Appellant's first and second points complain of the trial court's action in overruling its motion to change the venue from San Jacinto County. The appellant on the hearing on this motion made some proof as to the existence of some of the facts alleged in the motion. There was other testimony before the court, however, to the effect that the case had not been so widely discussed throughout the county as to make it doubtful that the appellant could receive a fair trial at the hands of the jury there. The trial court heard the evidence and saw the witnesses and overruled the application. The question of a change of venue in a civil case must be left largely to the discretion of the trial judge and unless it appears from the evidence that such discretion was abused the trial court's action will not be disturbed on appeal. Barrow v.

Barclay, Tex.Civ.App., 269 S.W. 235, writ refused; Freeman v. Cleary, Tex.Civ.App., 136 S.W. 521; Ferguson Seed Farms, Inc., v. Fort Worth & D–S. P. Ry. Co., Tex. Civ.App., 100 S.W.2d 177. We do not believe that an abuse of the trial court's discretion was here shown and these points must be overruled.

■ Appellant, by its third point, complains of the trial court's action in overruling its motion to quash the jury panel. This point deals with the fact that the list of jurors drawn for the week of November 16, 1951 was used for the trial of this case, beginning November 28, 1951. In view of our disposition of this appeal on other grounds, we think it unnecessary to discuss this point at length. Even though the article of the statute dealing with weekly jury lists was not strictly followed in this instance, we do not believe that any harm is shown by such action. In the absence of a positive showing of harm to the appellant, this action must be regarded as harmless error.

Points 4, 5, and 6 deal with alleged errors in the examination of the prospective jurors and in other such procedural matters involving the selection of a jury. We do not discuss these points because they become immaterial because of our disposition of the appeal on the other grounds.

■ Appellant's Points Nos. 7, 8, 9, 10, 11, and 12 all complain of alleged jury misconduct. The matter was gone into extensively by the trial court on the hearing on the motion for new trial. There was evidence introduced in support of appellant's allegations that the jurors discussed and considered the effects of their answers on the judgment, that the jurors agreed in advance to find for the plaintiff below and thereafter answered Special Issues in accordance with such agreement, that the jurors discussed the element of insurance by the railroad company, that they mentioned and discussed attorneys' fees in their deliberation and also discussed other matters of fact which were not in evidence. There also was evidence to the contrary and the

court by its action in overruling the motion for new trial has found as a fact that such misconduct did not occur. The appellant cites and quotes from numerous cases in this State dealing with the effect of misconduct of a jury. While there was strong evidence in behalf of appellant to the effect that the jurors first had a general discussion and took a vote to decide whether they were in favor of the woman or the railroad, and that they made their answers to the various special issues in the way that the foreman of the jury told them the answers should be made in order to find for the appellees, there was evidence to the contrary and we do not believe that the evidence can be regarded as insufficient to support the finding of the trial court. See Belt v. Texas Company, Tex.Civ.App., 204 S.W.2d 653 and cases cited therein.

■ Appellant's 13th point complains of the trial court's action in allowing the witness Sharp to testify as an expert witness in behalf of the appellees. Sharp was a former locomotive fireman and was allowed to testify to the operation generally of steam locomotives. He had never worked on any of the engines of T. & N. O.; he had looked at them and ridden in them and seen them operate and testified that the mechanical operation of handling all steam engines was the same. He then testified as to how a train can be stopped and how sometimes it lurches and jerks and what causes such action. The trial court heard the evidence as to the witness's qualifications and permitted him to testify. We do not believe that any abuse of the trial court's discretion is shown and we overrule this point in regard to the testimony of the witness Sharp without a lengthy discussion. We believe that the witness, by his own testimony, showed a sufficient familiarity with the operation of steam engines and trains to testify to the matters objected to.

■ The appellant's 18th point complains of the trial court's action in overruling its exceptions to Special Issue No. 31 and refusing its requested instructions in regard to that special issue. This issue dealt with the question of the elements of damage. The issue and instruction given in connection therewith are quoted above in this opinion. We believe that the trial court was correct in the instruction given and on the authority of Dallas Railway & Terminal Co. v. Orr, 147 Tex. 383, 215 S.W.2d 862, by the Supreme Court, this point is overruled.

Other points raised by the appellant complain of the insufficiency of the evidence to support the various findings of the jury in its verdict. In view of our disposition of the case on insufficiency of the evidence and argument of counsel we think it unnecessary to discuss these points.

For the errors noted above, the judgment of the trial court is reversed and remanded for a new trial.